NEBUS *v.* WEIN.

1. INSANE PERSONS—EXECUTION OF DEEDS.
   In guardian's suit to set aside deeds of real estate to ward's sisters because such transfers were without consideration, were procured by fraud and undue influence, and at a time when grantor was mentally incompetent, determination as to mental competency of grantor to make a disposition of his property related to time of execution of the deeds.

2. APPEAL AND ERROR—CHANCERY CASES HEARD DE NOVO.
   The Supreme Court hears chancery cases *de novo.*

3. SAME—CHANCERY CASES—EVIDENCE.
   In reviewing chancery cases it is the duty of the Supreme Court to weigh all the evidence and to reach a conclusion in accordance with the just rights of the parties after a review of the entire record and not reverse decree of trial court unless persuaded from the record as a whole that it is not in accordance with the just rights of the parties.

4. INSANE PERSONS—DEEDS—HALLUCINATIONS.
   Hallucination of grantor that his sons had had illicit relations with their mother who had recently secured divorce from him, which hallucination was determined by both trial court and Supreme Court to be without foundation in fact, but which was found to have caused him to deed real estate to his sisters rather than his sons, resulted in an act that was not that of a person competent to execute deeds.

5. SAME—HALLUCINATIONS.
   While a person may have hallucinations on certain subjects which will not necessarily render him incompetent to transact his business or to dispose of his property as he sees fit, when the hallucinations are the sole basis for the act under question, without which the action would not have been taken, then such act is not that of a person competent to act in relation thereto.

Transfer of property induced by mistake, see Restatement, Restitution, § 163.

6. DEEDS—HALLUCINATIONS OF GRANTOR—CONSIDERATION—PRESUMP-
TIVE HEIRS.

Deeds of real estate to grantor's sisters while he was suffering
from hallucinations that his sons had had illicit intercourse
with their mother from whom he had been divorced, which
deeds were without adequate consideration and obtained with
full knowledge of grantor's reasons for depriving his pre-
sumptive heirs at law of their inheritable rights in his prop-
erty, *held*, invalid.

7. SAME—INSANE PERSONS—CONSIDERATION—EVIDENCE—PROXIMITY
OF EXAMINATIONS—NATURE OF MENTAL DISEASE.

In suit by grantor's guardian, appointed upon hearing on peti-
tion filed before execution of conveyances of real estate by
grantor to his sisters, rather than his children, for a grossly
inadequate consideration, to set aside such conveyances, decree
is ordered entered for plaintiff, where evidence presented by
psychiatrists who had examined him a little over three weeks
before deeds were executed as well as 6 days prior and 10
days after execution raised conclusive presumption of mental
incompetency of grantor on day of execution to make an in-
telligent disposition of property in view of proximity of
examinations and nature of senile psychosis, a major mental
disease.

8. APPEAL AND ERROR—INSANE PERSONS—DEEDS—MENTAL COMPE-
TENCY—BURDEN OF PROOF.

Question as to where burden of showing mental competency and
fairness of transaction rested is not determined in suit by
guardian of grantor subsequently committed to a hospital
for the insane where evidence fully established mental in-
capacity of grantor at time deeds were executed.

Appeal from Wayne; George (Fred W.), J., pre-
siding. Submitted January 9, 1942. (Docket No.
9, Calendar No. 41,794.) Decided April 6, 1942.

Bill by Martin Nebus, guardian of Herman Nebus,
an insane person, against Charles Wein and others
to require conveyance of real estate and to compel
defendants to turn money and other property over
to plaintiff. Bill dismissed. Plaintiff appeals. Re-
versed.

*Arthur A. Ude,* for plaintiff.

*Scott, Wood, & Pace,* for defendants.

CHANDLER, C. J. Plaintiff, appointed general guardian of his father, Herman Nebus, an allegedly incompetent person, by the probate court for the county of Wayne on October 18, 1940, filed the bill of complaint herein on December 2, 1940, as such guardian, having been authorized so to do by said probate court, against Bertha Wein and Emma Zuchowski, sisters of his ward, to set aside two deeds to real estate made and executed by said ward on June 22, 1940, to said defendants, claiming that such transfers were without consideration and were procured by fraud and undue influence and at a time when plaintiff's ward was mentally incompetent. Defendants filed an answer denying all of the material allegations contained in the bill of complaint.

The allegedly incompetent person has a rather interesting case history. In August, 1937, he was before Recorder's Court Judge, John P. Scallen, on an assault and battery charge wherein he was alleged to have severely beaten his wife, the mother of his four children, ranging in ages from 23 to 34, three of them being sons and one a daughter. The case was referred to the psychopathic clinic of the recorder's court, which instituted proceedings in the probate court against Mr. Nebus, alleging that he was insane and potentially homicidal. Hearing on these proceedings was postponed from time to time and finally on November 8, 1939, the jury determined that said Nebus was sane and the proceedings were dismissed.

On May 18, 1940, Mr. Nebus was again in recorder's court upon a drunk driving charge and his case was again referred to the clinic for an examina-

tion and report, and the allegedly insane person was examined by two psychiatrists, Drs. N. J. Bicknell and M. O. Wolfe, who reported him insane and recommended proceedings for his commitment to a hospital for mentally diseased persons. Dr. Bicknell examined Mr. Nebus on June 16, 1940, and reported that he was actually insane and that his condition was such as to require care and treatment in an institution for the care, custody and treatment of the insane. He said he formed his opinion upon the following grounds:

"He does not recognize examiner as a physician or court official, but proceeds to recite a string of complaints with such repetitions 'You cannot cure the jerks. You cannot cure the knee jerks,' and so on for many times. He recites, without feeling, how he broke a club over his wife's head, and broke it in five pieces. He tells how he bought 175 cans of cheese, 48 cans of soup. Has definite delusions of persecution in regard to his work and family. Senile psychosis, depressive character."

Dr. Wolfe examined Mr. Nebus on the second day of July, 1940, and pronounced him as actually insane and that his condition was such as to require care and treatment in an institution for the care, custody and treatment of the insane. He based his opinion upon the following grounds:

"This patient is 63 years of age. He shows a marked reduction in the exercise of the higher intellectual functions on the basis of advanced arteriosclerotic disease of the brain. He shows a marked degree of perseveration and irrespective of what question is put to him he replies in a stereotyped manner. He begins by stating that all of his difficulties started when his car was stolen some years ago. He claims to have left his car for a few minutes and upon his return found it gone. He

looked for it for several hours and could not find it. As a result of that he claims to have been put in jail. The fact of the matter is that the patient was intoxicated at the time, caused considerable damage to his own car and to another and was apprehended by the police. His verbatim account is as follows: 'My money is tied up—tied up—tied up. Don't know where my car is—don't know where my car is—lost my car. I walk and stop—I walk and stop. My money was tied up because my car was stolen. A wheelbarrow knocked me over and now I have 15 kinks in the back.' The patient, while undergoing examination, proceeded to count the kinks in his back by feeling portions of his body. He is not correctly oriented; gives the month as June and recalls the year with difficulty. It is my opinion that the patient is not capable of adjusting himself on the outside. Because of his lack of judgment and insight he may be a menace to himself and to others.''

Dr. Selling testified on behalf of plaintiff and read into the record his report made to Judge John P. Scallen in August, 1937, as follows:

''This is a 60-year old white man, who was brought in. Born in Germany, has been in Detroit for most of his life. The physical examination reveals that he is senile, although he is still well developed, and well nourished; vision poor without glasses. There is opacity of both lenses, which is significant of increasing age; and his blood pressure is somewhat elevated. A psychological test would rate him feeble-minded. This is not of significance, inasmuch as he is suffering from a mental disorder. We have carefully examined the recommended case, and we have come to the conclusion that he is suffering from a major mental disease, senile psychosis. The worst part of this disease is that while it is relatively common, in this case he has the idea that his wife is unfaithful to him, and because of

this idea he is potentially homicidal. It is our opinion that this man can be committed to a State hospital for the insane. If your honor will give us an order we will carry out his commitment.''

Dr. Selling further testified that he again saw and and examined Mr. Nebus on or about May 28, 1940, and that in his opinion Mr. Nebus was insane at that time. The witness was then asked the following question:

''Did he have mental capacity on June 22, 1940, to know what he was doing in disposing of real estate?''

''*A.* It is improbable. I, of course, can't tell you exactly what his mental capacity was because the last time we saw him was in May, which was about a month before that, but it is improbable that he had improved at all, since he had deteriorated in three years.''

The controversy in this litigation solely concerns the mental competency of Herman Nebus on June 22, 1940, the date of the conveyances to his sisters.

Mr. Nebus is now an inmate of Eloise hospital, having been committed to said institution by the probate court for the county of Wayne on October 12, 1940, upon a finding by a jury that he was an insane person requiring care and treatment in a hospital or institution for the care of the insane. The petition to have Mr. Nebus committed to an institution as an allegedly insane person was filed in the probate court on June 13, 1940, said petition being filed by Martin Nebus, a son of said allegedly mentally incompetent person.

The first petition for the commitment of Mr. Nebus as an insane person was filed on September 3, 1937, by one Alan Canty, a peace officer of the county of Wayne, and upon the hearing in that proceeding seven physicians examined Mr. Nebus and

all reported him insane and all but two recommended his commitment to an institution for the insane, and these two, who did not recommend commitment, recommended the appointment of a guardian. The examinations made by these physicians were on various dates between May 6, 1938, and October 12, 1939.

There was no testimony from any medical witness that the patient was sane upon either the probate court hearing or upon the trial of the instant case.

We do not deem it necessary or advisable to detail the reports of the several doctors as to the mental condition of Mr. Nebus during the first sanity hearing, finding it sufficient to note the report of Dr. J. Clark Moloney, who examined the patient on May 29, 1938, and declared him actually insane basing his opinion upon the following grounds.

"This patient is a white male adult, 60 years of age. He is suffering from very definite delusions, such as, he believes his wife was impregnated by her own father, that only one of the boys is his own son. His son he believes had relations with his mother. Pt. feels he has been poisoned, that this poisoning has been going on for some time, one occasion having made him violently ill. The pt. makes these comments and his whole attitude is that of a delusional paranoid individual. His mental sickness is of committable degree, in fact, I would consider this man a very dangerous person to be left at large. He may turn upon his imagined persecutors at any time. Those that are not initiated into psychiatric ways might be inclined to take this pt's statements at face value and believe him to be actually persecuted, therefore, work in his behalf to have him freed. I cannot too emphatically state the danger of allowing this patient his freedom and recommend immediate commitment to Eloise or Ypsilanti."

The reports of the other six physicians who examined Nebus during the first hearing are similar to that of Dr. Moloney.

Herman Nebus suffers, according to the unanimous opinion of the doctors from a major mental disease—senile psychosis. As one doctor expressed it, he shows a marked reduction in the exercise of the higher intellectual functions on the basis of advanced arteriosclerotic disease of the brain, and he shows a marked degree of perseveration and irrespective of what question is put to him he replies in a stereotyped manner. From the testimony it was convincingly shown that he suffered from delusions, false beliefs, ideas of persecution, and other symptoms from which all the physicians who examined him concluded he was insane.

The deeds in controversy here were prepared by Oliver S. Smith, an attorney who had represented Mr. Nebus in considerable of his litigation. Mr. Smith's testimony was to the effect that he was called by telephone to the home of Mr. Nebus by Mr. Ward, a neighbor and friend of Mr. Nebus, and on the evening of June 21, 1940, arriving there, he found Mr. Wein and Mr. Zuchowski, husbands of defendants, Mr. Ward, and Mr. Nebus. He testified that Mr. Wein said to him, "We want you to draw the deeds that we have talked about;" that he obtained from Mr. Nebus the legal description of the property in which Mr. Nebus lived, but they did not have the legal description of the other parcel, which he obtained the next day from the tract index department; that the nature of the deed was discussed and the consideration, which was to be the support of Mr. Nebus for the remainder of his life, and that Mr. Nebus said that that was his wish and that he prepared the deeds the following morning

and delivered them to Mr. Nebus at his home. The witness further testified that he told Mr. Wein that he would not take any part in the execution of the deeds and when asked the reason why, told them, Wein and Zuchowski, that he regarded Nebus as incompetent to sign a deed and make a valid execution; that they all knew that a petition had been filed in the probate court to have him committed to an institution; that the actual conversation was:

"'They asked me what I thought of the execution of these deeds, and I said to Mr. Wein and Mr. Zuchowski, 'I would not give you a nickel for them.' And, they wanted to know why. And I said, 'In view of the man's condition.' Mr. Wein said to me, 'Well, he has not been declared insane yet.' I said, 'That is true, but his sanity was questioned less than a year ago; and his sanity is now being questioned again, and due to the number of conversations I have had with him, I do not think he is competent.' '"

This testimony was denied by Mr. Wein, but Mr. Zuchowski was not a witness upon the hearing in this case. Neither was defendant, Emma Zuchowski, sworn as a witness.

Mr. Nebus for about 18 years prior to 1939 had been in the employ of the Ford Motor Company, most of the time as an inspector in the crankshaft division, where it appears he had been an efficient and conscientious worker. By the year 1937, he had accumulated a substantial amount of property, owning three houses, some vacant lots, an automobile and had a substantial sum of money in the bank and in the Ford savings fund in the amount of at least $5,800.

It appears from the record that for a number of years he had had trouble with his family, based

wholly on a belief held by him that his children had improper relations with their mother. The trial court found that there was no foundation in fact for this belief.

The marital troubles of Mr. and Mrs. Nebus culminated in August, 1937, at which time he severely beat his wife, and on September 1, 1937, Mrs. Nebus filed a suit for divorce. The divorce case was finally disposed of by a decree entered on June 30, 1939, granting to the wife a divorce and awarding her alimony in the sum of $4,000 cash, a portion of the household goods, and one of the houses and lots owned by Mr. Nebus.

Mr. Nebus apparently lived alone in one of his houses after separation from his wife and continued to live there until committed to the hospital. He was a frequent visitor at the home of his sister, Mrs. Wein, and when there at mealtime was always invited to partake of the meal and, upon occasions, Mrs. Wein sent him some food. It does not appear that this sister did any more for him subsequent to the execution of the deed than before, excepting that she did his laundry work and upon a few occasions cleaned his rooms. Mr. Wein was apparently kind to Mr. Nebus and frequently brought him cases of beer and to a considerable extent looked after his welfare. It does not appear that the other sister, defendant herein, or her husband, ever gave Mr. Nebus any particular attention either before or after the execution of the deeds.

As bearing upon the concern of the brother-in-law Wein and the brother, Charles Nebus, who were made defendants in this case, it might be well to note that from 1937 or thereabouts until about the time of the execution of the deeds, Mr. Charles Nebus had the custody of Herman's money. At one time he had in his possession upwards of $5,000

which was eventually used in payment of the alimony award, attorney fees, and other expenses until the amount was reduced to about $900 or $1,000 at about the time of the execution of the deeds when this money was turned over by Charles Nebus, at the request of Herman, to the brother-in-law Wein, where it remained until it was delivered to a custodian appointed by the court during the pendency of the instant proceedings.

It is also noted from the record that sometime in May, 1940, after the arrest of Herman on a drunk driving charge, the title to Herman's car was turned over to Mr. Wein, who later turned the title and car over to the custodian appointed by the court, and which car has since been sold and the proceeds of which are now in the hands of such custodian. It is apparent that Mr. Wein took the title to the car because the same had been impounded by the police and was soon to be sold for storage unless the impounding fees were paid.

It is significant as bearing upon the condition of Mr. Nebus that Mr. Wein did not permit him to have possession of the car, but kept it in a garage other than Mr. Nebus' for fear Mr. Nebus would drive it and again get into trouble.

The only witnesses that were sworn by the defendant who gave testimony as bearing upon the mental competency for Mr. Nebus was the notary who took the acknowledgment, Mr. Nebus' foreman, and a Mr. Ward. The notary was only casually acquainted with Mr. Nebus, having met him on the street and also talked with him at the polling place where she was an inspector. She testified that upon the occasion of the signing of the deed it was just the ordinary procedure and just a casual conversation among the people who were there. She testified that her husband was one of the witnesses to

the deed and that while Mr. Nebus was there she noticed nothing unusual in his appearance. There was nothing said to him by anybody to get him to sign the deed. Mr. Nebus' foreman was sworn as a witness, but he was not definite as to when he had last seen Mr. Nebus, but thought about two years or two and a half years ago when he was rehired as an inspector and said he attended to his work regularly, and that he, the witness, did not observe any abnormal action on the part of Mr. Nebus. The other witness, Mr. Ward, a neighbor and friend of Mr. Nebus, testified to the effect that he had not observed any difference in the mental condition of Mr. Nebus during the last 14 years. It is to be noted that Mr. Ward was with Mr. Nebus on most of the occasions when he visited his attorneys, and upon practically all occasions when attempts were being made to settle the question of alimony between Nebus and his wife. This witness admitted, however, that at the time of the first sanity hearing he testified that Mr. Nebus was "screwy" and by that he claimed to have meant "peculiar."

At the conclusion of the hearing, the trial court filed an opinion, and in view of his findings and conclusions we deem it essential to quote this opinion in full:

"A few years ago divorce proceedings were instigated by his wife and a property settlement was made between the said Herman Nebus and his wife in which he took an active part in the details, and sometime afterwards a petition was filed to have the said Herman Nebus adjudged insane, and the matters tried before a court of competent jurisdiction, which resulted in a finding that he was sane.

"A few months afterwards he deeded to his two sisters two pieces of real property situated in the city of Detroit, in which deed was an agreement for care and support, and the matter comes before the

court to have these conveyances set aside for the reason of his incompetency.

"I believe there were three sons living, and it is their contention that by reason of the father's incompetency, .these conveyances should be set aside. These sons are very fine young men and ordinarily should inherit the father's property.

"Some months after these conveyances were made, a further petition was filed for the purpose of having the said Herman Nebus adjudged incompetent, and he was found to be incompetent, but at the time the conveyances were made, the record shows that he at all times clearly understood the extent of the estate and all matters in reference thereto. His reasons for deeding to his sisters instead of his sons had no foundation in the opinion of the court in fact, but it was a hallucination on the part of the father, who claimed that there had been illicit relations between the sons and the mother. The court does not believe there was any truth, of course, in such an idea, but nevertheless, it was the father's conclusion. It is well known that people may have hallucinations on certain subjects but still their minds may be perfectly clear on other matters.

"Objection was made by the plaintiff that the sisters were not fulfilling the provisions in the deeds in respect to care and support, but he seemed to be perfectly satisfied and no complaint was made by him, and he was the only one that could make such a complaint.

"There is not sufficient testimony in the record to prove that at the time such conveyances were made that Herman Nebus was incompetent to handle and manage his property; therefore, · the court is of the opinion that the said conveyances to the sisters are valid and that the plaintiff has no case and a decree may be prepared to that effect."

A decree was entered dismissing plaintiff's bill of complaint and further decreeing that upon the

filing of a surety bond in the sum of $1,500 by Charles Wein that the moneys of the allegedly insane person be turned over to said Wein who should render an account to the court as trustee one year from the signing of the decree and yearly thereafter concerning said moneys. It is from this decree that plaintiff appeals.

We find the only question for determination is, as we heretofore said: "Was Herman Nebus mentally competent on the 22d day of June. 1940, to make a disposition of his property?"

We hear chancery cases *de novo*. It is therefore our duty to weigh all the evidence and to reach a conclusion in accordance with the just rights of the parties after a review of the entire record, and we should not reverse the decree entered by the lower court unless we are persuaded from the record as a whole that it is not in accordance with the just rights of the parties.

It is clearly apparent that Herman Nebus was imbued with the idea, obsession, hallucination, or whatever it may be termed, that the relations of his sons and their mother were illicit, and that this was his reason for the execution of the deeds of conveyance involved in this litigation, and we determine as a matter of fact that such hallucination and obsession was without any foundation in fact, and that it was by reason thereof that he had deeded the property in question to his sisters rather than to permit these sons, whom the court found "are very fine young men and ordinarily should inherit the father's property" to take the same by inheritance.

The trial court found:

"His reasons for deeding to his sisters instead of his sons had no foundation in the opinion of the court in fact, but it was an hallucination on the

part of the father who claimed that there had been illicit relations between the sons and the mother. The court does not believe there was any truth, of course, in such an idea, but nevertheless it was the father's conclusion.''

In view of the findings of the trial court that there was no truth in, or foundation for, these hallucinations, and with which finding we are in accord, we must hold the trial court was in error in his conclusions that the conveyances should be held to be valid.

We appreciate that a person may have hallucinations on certain subjects which will not necessarily render him incompetent to transact his business, or to dispose of his property as he sees fit, but when such hallucinations are found to be the sole basis for such act, and without which such action would not have been taken, then it must be held that such act is not that of a person competent to act in relation thereto. In this case, Mr. Nebus, as the trial court found, without any foundation in fact, dwelled upon, nursed and harbored the obsession that the relations of his wife and his sons were not proper, to the extent that he had become, as the physicians said, insane and potentially homicidal. We must hold that the execution of deeds of conveyance under these circumstances, without adequate consideration, renders such conveyances invalid, and particularly so in the instant case where the grantees obtained said deeds from their brother without consideration, with full knowledge of the grantor's reasons for depriving his presumptive heirs at law of their inheritable rights in his property.

It is the claim of the defendants that there is no testimony showing mental incompetency on the part of Mr. Nebus on the date of the execution of these deeds, June 22d. There was competent and

uncontradicted· testimony of psychiatrists as to his mental condition on May 28, 1940, a little over three weeks before the execution of the deeds, on June 16, 1940, six days before the execution of the deeds, and on July 2, 1940, ten days after the execution of such conveyances; and in view of the nature of the mental disease from which the allegedly incompetent person was suffering, the presumption is conclusive that the condition of Mr. Nebus was the same on June 22d as it was just prior and just subsequent thereto. *Haines* v. *Hayden,* 95 Mich. 332 (35 Am. St. Rep. 566); *Spencer* v. *Terry's Estate,* 133 Mich. 39.

In our opinion, there was such a great weakness of mind on the part of Mr. Nebus that he was disqualified on the date of the conveyances of his own free will and accord to make an intelligent disposition of his property, and that in view of such mental weakness and of the fact that the consideration was so grossly inadequate, a court of equity, on application of the legal representatives of Mr. Nebus, should unhesitatingly set said conveyances aside.

There is considerable discussion in the briefs of the respective parties as to where the burden of proof lies, the plaintiff contending that the burden is upon the defendants because of their relationship to the grantor to show competency and the fairness of the transaction, defendants contending that the burden is upon the plaintiff to establish incompetency because the record does not show the existence of any fiduciary relationship between the grantees and grantor.

We deem it unnecessary to discuss or determine this question, because we find from the record that the mental incapacity of Herman Nebus to execute the deeds in question is fully established.

We find, therefore, that the decree of the court below must be reversed, said deeds held invalid, and the plaintiff granted the relief sought in his bill of complaint. A decree may be entered accordingly. Said decree shall also provide that the custodian, appointed by the court below, shall turn over to the plaintiff, as guardian of Herman Nebus, all moneys deposited with him by Charles Wein and also the proceeds derived from the sale of the automobile in question. Plaintiff may recover costs of both courts.

BOYLES, NORTH, STARR, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., did not sit.