CROSSETT LUMBER COMPANY *v.* McCAIN, COMMISSIONER OF LABOR.

4-6995                                     170 S. W. 2d 64

Opinion delivered April 5, 1943.

*Williamson & Williamson,* for appellant.
*Luke Arnett,* for appellee.

McHANEY, J.   Appellant is a large processor of timber products. It owns about one-half million acres of timber lands covering a territory in southeast Arkansas and northeast Louisiana 30 miles wide by 80 miles long. It owns and operates a large lumber manufacturing plant, a paper mill or pulp plant and a chemical plant all in Crossett, Arkansas. It has about 1,650 employees on its payrolls in its mills and plants, on all of which employees it has paid the Social Security tax. Prior to 1934 appellant did its own logging by its own employees. From about 1902 to 1934 appellant did its logging by cutting all the merchantable timber adjacent to its mill and near enough to haul the logs with teams or trucks. As the near timber was cut out, remoter tracts were logged by building a railroad line to the timber and the logs would be brought to the mill by rail. Logging camps were established and that system of supplying logs to the mill was referred to by Mr. Norman, secretary of appellant, as the Logging Camp System. About 1924, appellant had a survey of its forests made with the view of extending the life of its operations through scientific forestry, and for the next ten years, it was preparing to enter upon what is called the "Sustained Yield Program," which means that only a safe percentage of the growth of the trees is cut each year, leaving a safe percentage for future growth, reseeding, protection from fire, and protection of all young growth. Quoting Mr. Norman, "It means cutting scientifically instead of cutting everything you can get and quitting. It means planning the cut for years in advance and distributing the cut over all the acreage in order that the growth, properly protected, will insure almost perpetual operation." All of which forestry practice is fostered by the Forestry Service of the United States Department of Agriculture and by the Forestry Commission of Arkansas.

The transition from the "Logging Camp System" to the "Sustained Yield Program" was completed about 1934, and appellant thereafter did its logging operations for its sawmill, pulp mill and chemical plant through contractors who furnished their own equipment, who

hired and fired their own employees, and who were paid "according to the owner's current published rate schedule in effect at date of delivery." Same being so much per M. feet of logs, so much per parcel of chemical wood, and so much per pen of pulp wood.

It is stipulated that this change in the method of operation was not made in anticipation of the so-called New Deal legislation of recent years, or to evade the payment of any taxes arising thereunder, such as Social Security, Unemployment Compensation, Workmen's Compensation, Wage and Hour Law, etc.

The National Social Security Act was enacted by Congress in 1935, 42 USCA, c. 7 (Supp.), par. 301. Arkansas entered the field in 1937 by the enactment of act 155 of 1937 known as Unemployment Compensation Law. This act was amended by act 200 of 1939. In 1941, the Legislature repealed both former acts by act 391 of that year and enacted what it designated in § 1 as the "Arkansas Employment Security Act." These acts are very lengthy and we do not undertake a summation of them.

On July 9, 1940, Robert E. Linder, a timber cutter, filed a claim for unemployment compensation with appellee, unemployment being due to a shut down of appellant's mills caused by a strike of certain of its employees, with which, we assume for the purposes of this opinion, Linder was not connected. Some 34 others similarly employed as was Linder, that is, nearly all of them were timber cutters hired by and working under and for alleged independent contractors and a few being the contractors themselves, filed similar claims to that of Linder. All based their claims for compensation on the allegation that they were employees of appellant. These claims were referred to a claims deputy who made an investigation and denied them because of "no wage record and the lack of qualifying earnings." From this determination, claimants appealed to the appeals referee, before whom a hearing was had, appellant participating, and on June 5, 1941, a decision was rendered which reversed the action of the claims deputy and held that

claimants were eligible to receive benefits, based upon their earnings from appellant. In other words, that claimants were employees of appellant. Appellant's right to participate in this and subsequent proceedings has not been questioned, and we think it has such right. As said in *Chrysler Corporation* v. *Smith,* 297 Mich. 438, 298 N. W. 87, where the question was raised, "As a contributor to the fund, having an interest in its proper disbursement, it was the right of the corporation, if not its duty, to see that the purpose and full integrity of the fund was preserved." See, also, *Chrysler Corp.* v. *Appeal Board,* 301 Mich. 302, 3 N. W. 2d 303. This decision of the appeals referee was after the enactment of act 391 of 1941, but before its effective date, July 1, 1941. Therefore, this decision was based on act 155 of 1937, as amended by act 200 of 1939. An appeal was then prosecuted by appellant to the Industrial Board and on August 1, 1941, after the effective date of said act 391, it made the following findings of fact: "The appellant, Crossett Lumber Company, is the owner of a large tract of timbered lands in southeast Arkansas and northeast Louisiana, approximately 450,000 acres. Claimants, Robert E. Linder and Group Nos. I and II are timber cutters and were so engaged in 1939 and 1940. It was their duty to cut trees from the forests designated by some employee of the lumber company. All of these claimants were employed by individuals who had entered into a contract with the lumber company to cut and deliver timber to the yards of the Crossett Lumber Company in Crossett, Arkansas. The lumber company was to pay for said timber under the contract according to the owner's current published rate schedule in effect at date of delivery.

"There are numerous individuals who operate under written agreements with the company and in most instances identical; that said contracts were made for a period of one year unless sooner canceled by the parties, each of which had a right to cancel same without cause upon three days' notice. The company employs district supervisors who are in charge of operation on respective tracts of land and this employee has entire supervision over all of the forests and over the individuals who cut

and remove timber therefrom. The supervisor makes the contracts for and on behalf of the lumber company with the individuals to cut and remove said timber and designates the timber for them to cut and remove, has full control over the quantity of timber cut and removed under said contract, and in some instances exercised control over the claimants who were cutting and removing said timber. It is the duty of the supervisor to see that the contract is complied with and to move the timber cutters from place to place at will. The supervisor had full control over the amount of time worked by the timber cutters and controlled the amount of timber cut and delivered and to stop the work entirely at the pleasure of the lumber company. There was never any discussion with reference to the making of the agreements between the company and contractors. The contractors were required to sign them by the supervisor who presented them to them for their signature. Most of the contractors never read the contract. The company changed the type of contract used by them in 1940. The new form provided that the owner should have no control over the contractor but there was no change in the operation and the methods by the company at the time it changed its contracts, but the work was carried on in the same manner in which it had been carried on for a number of years.''

The decision of the appeals referee was affirmed. On August 6, 1941, appellant filed with the clerk of the Pulaski circuit court its petition for review, setting up the actions of the appeals referee and the Industrial Board, that said actions were erroneous, without evidence to support them, and prayed that such actions be reversed and it be adjudicated that it was not the employer or employing unit of any of the claimants. An answer was filed by appellee, to which was attached the opinions of the appeals referee and the Industrial Board. It was stipulated by the parties that claimants were employed by some one and that they were entitled to benefits, appellant contending that they were not its employees and that no tax should be levied against it as such employers.

The parties stipulated that the claim of Robert E. Linder should be used as the typical case of all other claims and that the final determination of his rights should govern all others.

Trial before the court on the record made, and on the findings, conclusions and decision of the Industrial Board, resulted in a judgment affirming the decision of the Industrial Board. This appeal followed.

We are convinced that the correctness of this decision must be determined under the provisions of act 391 of 1941, and that act 155 of 1937 and its amendatory act 200 of 1939 cannot be considered for any purpose. We reach this conclusion, not only because the former acts were specifically repealed by said act 391, but because the whole context of said act shows the legislative intent to change the existing law in many particulars and to substitute it for the former statutes. For instance said act provides for its retroactive operation for the whole period of time covered by the former statutes. In § 2 (h) (1) (A), (B) and (C) the term "Employer" is defined as: (A) "For the calendar years 1937 through 1940, any individual or employing unit which . . . has had in employment one or more individuals," etc. (B) Covers the calendar year 1941, and (C) 1942 and thereafter. Subsection (i) (1) of § 2 defines "employment" as "any service performed prior to July 1, 1941," etc. In subsection (g) of § 2 "employing unit" is defined as "any individual or type of organization . . . which has, or subsequent to January 1, 1936, had one or more individuals performing service for it in this state."

The Legislature had the power to substitute act 391 for the former acts and to make it retroactive, provided it did not disturb any vested rights. No private rights could become vested under the provisions of the former act because in § 19, digested as § 8567 of Pope's Digest, it is expressly provided otherwise, as follows: "The Legislature reserves the right to amend or repeal all or any part of this act at any time; and there shall be no vested private right of any kind against such amendment

or repeal. All the rights, privileges, or immunities conferred by this act or by acts done pursuant thereto shall exist subject to the power of the Legislature to amend or repeal this act at any time." A like provision is contained in § 19 of act 391. So we conclude that no rights vested in claimants or in claimant Linder to have his claim determined under acts existing at the time his claim was filed or at the time of the decision of the claims referee, the Industrial Board or the trial court. We, therefore, conclude that act 391 repealed the former Unemployment Compensation Law and that the legislative intent was the provisions of act 391 should control in the adjudication of cases pending, and not finally determined at its effective date, July 1, 1941.

The next and most important question to be determined is whether appellant was the employer of Linder and the other claimants, or were they employees of independent contractors, or contractors themselves.

In determining this question, we must bear in mind the following provision in § 6 (d) (7) of act 391: "In any proceeding under this subsection the findings of the Industrial Board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive and the jurisdiction of said court shall be confined to questions of law." We assume, for the purpose of this decision without so holding, the validity of this provision.

Said act 391 defines the term "employment relationship" as follows in § 2 (i) (5): "Services performed by an individual for wages shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commissioner that . . ." then follow the (A), (B) and (C) conditions set out in the former act 155 and quoted in *McKinley* v. *Payne & Son Lumber Co.*, 200 Ark. 1114, 143 S. W. 2d 38, with these changes: Subdivisions (A), (B) and (C) in act 155 of 1937 were connected with the conjunction "and," whereas in act 391, the disjunctive "or" is used; and, in addition, there is added the following at the end of subsection (C): "provided, however, this act shall be construed to apply only where the legal relationship of master and

servant exists; and independent contractors, as defined by the common law of the state, shall be deemed employers, or the employing unit, and not employees; the foregoing definition governing employment relationship shall apply solely for the purpose of the administration of this act and for no other purpose. The statutory employee created by this act shall not abrogate the common-law definition of master and servant as the same applies in actions in tort, nor shall the supervision and control required for the purposes of this act to be exercised by an employing unit over said statutory employees be admissible in actions in tort.''

This provision of act 391 was no doubt enacted to correct or amend our opinion in *McKinley* v. *Payne & Son Lumber Co.*, supra, where language was used which appears to have been unnecessary to a decision of the case, to the effect that the statutory (A), (B), (C) definition of an independent contractor was broader than the common-law concept thereof. We do not mean to impair or overrule the holding in that case that the employee, Bailey, was not an independent contractor. Under the facts in that case he was an employee. Whether such was the purpose, it is now made clear and certain that ''independent contractors, as defined by the common law of the state, shall be deemed employers, or the employing unit, and not employees.''

With these matters in view, let us now examine the legal relationship existing between Linder and appellant, or between appellant and Walter Holland, the contractor who hired Linder. The contract between appellant and Holland (and all other contractors) was in writing and it recites that appellant as owner is the owner of certain timber lands from which it is desired that certain of the forest products thereon be cut and delivered to it, as provided therein; and that Holland, called ''contractor'' ''is engaged, or is equipped to engage, in the business of cutting and hauling forest products upon a contract basis''; (1) to cut ''chemical wood'' from the ''east block'' in Ashley county; (2) ''of such kind, grade, length and size'' as the owner may specify; (3) to be

delivered to appellant's logging railroads; (4) at the rate of not less than 25 nor more than 150 parcels each week; (5) without "unnecessary waste and without unnecessary damage or injury to timber left standing;" (6) "in a workmanlike manner which shall be (in the opinion of the owner) in accordance with sound practices of timber conservation and reproduction as advocated by federal and/or state authorities"; (7) "owner shall have no control over contractor"; (8) but contractor, exercising an independent employment, will do the work according to his own methods, without being subject to control of owner, except as to the result of the work to be done; (9) owner to pay contractor upon delivery, but no oftener than weekly, for all products cut and delivered, "according to the owner's current published rate schedule in effect at date of delivery;" (10) provides for revocation of contract by owner on written notice, if contractor shall fail to furnish owner, on request, satisfactory evidence that contractor has complied with all federal and state laws and regulations, the violation of which by contractor would subject owner to any liability; (11) contractor agrees to furnish, at request of owner, for inspection his books, records, etc., relating to wages and hours of his employees; and (12) shall continue for one year from date, unless sooner canceled at the option of either party on three days' written notice.

There is nothing on the face of this contract that would make it other than what it purports to be—a contract between an owner and an independent contractor, and if that relationship is to be destroyed, it must be found in the evidence, and we do not find it. Still bearing in mind the provision of the act, heretofore quoted, to the effect that the findings of fact of the Industrial Board, in the absence of fraud, shall be conclusive on the courts, we fail to find in the findings of the Industrial Board any fact or facts that is or are sufficient to destroy the owner and independent contractor relationship and to create the relationship of master and servant. We do not again set out the Industrial Board's findings of fact, nor do we pick them out and comment on them separately. It appears to us that the evidence is wholly undisputed

that the contractors were in fact and in law independent; that they hired and discharged their own employees; that they paid them; that either the contractors or the men furnished their own equipment, tools, trucks, saws, axes; that the men were paid by the contractors on a "piece" basis; that while appellant has a record of the amount paid to the contractors, based upon its current published schedule, it has no record of the amount paid by the contractors to the men nor did it know the men so employed; and that there was no control exercised by appellant over the contractors or the cutter, except as to the result to be accomplished. The fact that the written contract between appellant and its contractors reserves the right of either to terminate the contract on three days' notice is not determinative of the question.

We think this case is ruled adversely to appellee by the recent case of *Moore and Chicago Mill & Lbr. Co.* v. *Phillips*, 197 Ark. 131, 120 S. W. 2d 722. There, Moore and Chicago Mill & Lumber Company entered into a written contract embodying many, if not all, the terms of the contract here involved, and we held it created the relation of owner and contractor and not that of master and servant. We there said: "There is nothing in the contract showing an intent upon the part of the company to retain control or direction of Moore in the exercise of the means or methods by which he should perform the contract. There is no direction relating to the physical conduct of Moore, or his employees, in the execution of such contract. True it is there are certain directions to be observed by the contractor in the cutting of the timber, especially as to place and dimension; but these are specific and definite and are similar to plans and specifications so often found in contracts covering the performance of labor of similar character. Their design is to produce a given result. There are many decisions of this court holding to this effect. The governing distinction is that if control of the work reserved by the employer is control not only of the result, but also of the means and manner of the performance, then the relation of master and servant necessarily follows. On the other hand, if control of the

means be lacking, and the owner does not undertake to direct the manner in which the employee shall work in the discharge of his duties, then the relation of independent contractor exists. *St. L., I. M. & S. Ry.* v. *Cooper*, 111 Ark. 91, 163 S. W. 160; *Ark. Land & Lbr. Co.* v. *Secrist*, 118 Ark. 561, 177 S. W. 37; *Harger* v. *Harger*, 144 Ark. 375, 222 S. W. 736; *Harkins* v. *National Handle Co.*, 159 Ark. 15, 250 S. W. 900.''

Unquestionably, if claimants were suing appellant in tort for personal injuries, we would hold that appellant was not their employer and that the doctrine of respondent superior had no application to it, just as we did in the action of *Moore and Chicago Mill & Lbr. Co.* v. *Phillips.* Since act 391 of 1941 expressly provides that it ''shall be construed to apply only where the legal relationship of master and servant exists,'' and that ''independent contractors, as defined by the common law of the state, shall be deemed employers, or the employing unit, and not employees,'' it necessarily follows that appellant is neither the employer nor the employing unit of claimants and that it cannot be required to pay a social security tax on persons not in its employment.

As was well said by the Supreme Court of Mississippi, in *Texas Company* v. *Wheeless*, 185 Miss. 799, 187 So. 880, in connection with a verbatim provision of the Unemployment Compensation Law of that state: ''Upon what theory would the Legislature have sought to impose the obligation for the care of employees who may become unemployed upon someone who is under no obligation to pay their wages during the period of their unemployment.'' The whole act is founded upon the employer-employee relationship, absent which the act does not apply, and nowhere in the act is there to be found anything to indicate a legislative intent to destroy the independent contractor concept of existing law, or to subject to its terms any other relation than that of master and servant or employer and employee.

We, therefore, conclude that Linder and the other claimants were employees of independent contractors or

were themselves such contractors, and that they were not employees of appellant.

The judgment is reversed, and as to appellant it is dismissed.

ROBINS, J., (dissenting). I disagree with the holding of the majority of the court that this proceeding is controlled by Act No. 391 of the General Assembly of 1941. This act went into effect on July 1, 1941. The work done by the claimants which entitled them to unemployment benefits was performed during the year 1939. The claims were filed on July 9, 1940. The hearings on these claims were conducted in April, 1941. The decision of the appeals referee, in which he determined that the claimants were eligible to receive benefits, and that the Crossett Lumber Company was the employer, was rendered on June 5, 1941. The only law affecting the situation, when the work which made these men eligible as employees was done, when the unemployment which entitled them to the benefits occurred, when the claims were filed; when the claims were heard, and when the claims were decided by the appeals referee, was Act No. 155 of 1937, as amended by Act No. 200 of 1939. If this act of 1937, as amended by the act of 1939, was not in force when this work was done, when the claims arose, when they were filed, and when they were heard and decided by the appeals referee, then there was *no law* whatever authorizing the filing, hearing, or deciding of these claims, because the act of 1941 was not in existence when all these events occurred. But it is held by the majority that the act of 1941 was by its terms retroactive, and that, since the General Assembly in this act legislated away the effect of the decision of this court in the case of *McKinley, Commissioner* v. *R. L. Payne & Son Lumber Company*, 200 Ark. 1114, 143 S. W. 2d 38, the provisions of this latter act should be applied to and should control the case at bar, even though it arose under and was tried by the lower tribunal under the former act. While some provisions of the act of 1941 may be said to be retroactive, there is nothing whatever in this act that indicates that it was the intention of the legislature that these retroactive provisions should be applied to cases pending at the time of the passage of the

act. It is true that the act of 1941 repealed the act of 1939, but § 13284 of Pope's Digest provides as follows: "No action, plea, prosecution or proceeding, civil or criminal, pending at the time any statutory provisions shall be repealed, shall be affected by such repeal, but the same shall proceed in all respects as if such statutory provisions had remained in force." It should be conclusively presumed that the legislature, in enacting the 1941 law, did so with the full knowledge of the provisions of § 13284, *supra,* and without any intention whatever to make the 1941 act apply to proceedings pending at the time the act was passed.

In the case of *State ex rel Cleveland Railway Company* v. *Atkinson,* 138 Ohio St. 157, 34 N. E. 2d 233, the court had under consideration the effect of the repeal of the original unemployment compensation act of that state by a subsequent act on a proceeding brought by an employer for a determination as to seasonal or casual employment. In the first act the right of appeal from the decision of the unemployment commission was given, but in the latter act such right was not given. Section 26 of the General Code of Ohio is as follows: "Whenever a statute is repealed or amended, such repeal or amendment shall in no manner affect pending actions, prosecutions, or proceedings, civil or criminal . . . nor shall any repeal or amendment affect causes of such action, prosecution, or proceeding, existing at the time of such amendment or repealing act." The Ohio court held that a proceeding before the unemployment compensation commission was within the scope of § 26 of the General Code, and held that the provisions of the original act applied to the proceeding under consideration, saying: "Section 26 is a salutary statute and should be preserved against emasculation by judicial interpretation. Its nature is such as to require it to be read in connection with every amending and repealing statute which affects pending actions prosecutions or proceedings or existing causes of action, prosecutions or proceedings, for purposes of statutory construction. It is with knowledge of the existence of the general saving provision and its effect upon every revision or repeal of remedial statutes that the General Assembly acts."

Section 13284 of Pope's Digest has been frequently construed and the provisions thereof enforced by this court. In the early case of *Cannon* v. *Davies,* 33 Ark. 56, it was said: "And although the law, under which the change was made, was repealed by the act of March 2d, 1875, this action having been previously commenced, and pending as an action of ejectment at the time of the passage of the act of 1875, the repealing law did not affect the pending action, or the rights of the parties thereto . . ." The court, in the case of *Carle* v. *Gehl,* 193 Ark. 1061, 104 S. W. 2d 445, in passing upon this section, said: "Since the judgment in the court below and the filing of the case in this court, Act No. 264 of the Acts of 1937, in express terms, repeals Act No. 142 of the Acts of 1935 relied upon by appellant. In one of the supplemental briefs, filed by counsel when their attention was called to the repeal of Act No. 142, the position is taken that as the remedy provided by said act invoked in the pending proceeding no longer exists all rights under it are concluded by its repeal. In other briefs the same contention is made on the theory that Act No. 142 should be treated as a statute of limitation. There is authority to support these contentions, but whatever the law may have been in other jurisdictions, even that supported by the weight of authority, it has no effect because of the effect of § 9759 of Crawford & Moses' Digest which is as follows: 'No action, plea, prosecution or proceeding, civil or criminal, pending at the time any statutory provisions shall be repealed, shall be affected by such repeal, but the same shall proceed in all respects as if such statutory provisions had remained in force.' So far, then, as the instant case is concerned, and all others filed prior to the repealing act, Act No. 142 of the Acts of 1935 is in full force and effect, . . ." Other cases in which the provisions of § 13284 of Pope's Digest have been held to make controlling the law in force at the time the proceeding was filed are *McAllister* v. *Wright,* 197 Ark. 1156, 127 S. W. 2d 645; and *Kansas City Life Insurance Company* v. *Moss,* 196 Ark. 553, 119 S. W. 2d 524. None of these decisions are overruled or modified by anything said in the opinion in the case of *Fort Smith Gas Company* v. *Kincannon,* 202 Ark. 216, 150 S. W. 2d 968. On

the contrary, the court in that opinion referred to these decisions and expressly stated that it adhered to them, but based its decision in that case solely on the ground that Act 314, the amending act, did not "divest the plaintiff of his right to sue to recover damages to compensate his injury" but merely changed the forum in which that right could be enforced, and said: "In other words, § 13284 of Pope's Digest preserved rights in existence under other statutes, which were not divested by the repeal of the law under which those rights had accrued." Certainly under the act of 1937 these workmen had certain rights as to unemployment benefits, and the State of Arkansas had certain rights as to collection of contributions. The General Assembly in the act of 1941 did not attempt to abolish or change these rights by any express language of the act. There is nothing in the act of 1941 from which we can read an intention of the General Assembly to make the act applicable to pending proceedings. Since this is true, clearly the provisions of § 13284 of Pope's Digest require that the proceeding be governed by the provisions of the original act.

I concur in that part of the opinion of the majority of the court which allows recovery of the amount of the claims by these workmen, but dissent from so much thereof as holds that by reason of the provisions of the act of 1941 the State is denied the right to collect contributions, based on the earnings of these claimants, from the appellant.