ICE SERVICE COMPANY *v.* GOSS, COMMISSIONER OF LABOR.

4-8578                                     212 S. W. 2d 933

Opinion delivered July 5, 1948.

*House, Moses & Holmes,* for appellant.

*Luke Arnett,* for appellee.

GRIFFIN SMITH, Chief Justice. The question is whether persons operating ice delivery routes in Pine Bluff, who use horse-drawn vehicles owned by the Company and pay five cents per hundred pounds for the equipment, are employees or independent contractors within the meaning of Act 391 of 1941.

M. E. Goss is Commissioner of Labor, charged with specific administrative duties, including collection of the so-called unemployment compensation tax. From the Commissioner's determination that the tax was payable by Ice Service Company an appeal was taken to the Board of Review,[1] and the finding was sustained. Appeal to Circuit Court terminated in like manner.

The Act accords an independent status to one performing duties under a contract if the individual has been and will continue to be free from control or direction "over the performance of [the services rendered or contemplated] both under his contract of service and in fact."

Tested by this definition, were the delivery men employes, or were they independently engaged, within the rule discussed in *Moore and Chicago Mill & Lumber Co. v. Phillips,* 197 Ark. 131, 120 S. W. 2d 722, and *Crossett Lumber Co. v. McCain, Commissioner of Labor,* 205 Ark. 631, 170 S. W. 2d 64?

Ice Service Company is not a manufacturer. It purchases the output of local producers and distributes at

---

[1] Duties imposed upon the Industrial Board created by Act 391 of 1941 were transferred to the Commissioner of Labor by Act 126 of 1943. Appeals such as we are dealing with were, by § 2 of Act 126, "transferred to the Board of Review."

wholesale and retail. Prior to 1940 customers were served from trucks or wagons operated by the Company at a wage scale of approximately $2.50 per day, sometimes supplemented by commissions. Failure of the Company to meet wage demands resulted in a strike, in consequence of which there were agreements by Service Company to sell ice to the men at 25c per hundred pounds if the men supplied their own transportation, or 30c per hundred if the Company allowed use of horse and wagon. Quite a number of those who could not furnish delivery facilities have been using Company units. The Labor Commissioner does not contest an independent status for drivers using their own transportation; but in respect of those who pay the additional charge it is contended they are employes. Appellant challenges the Court's finding to this effect.

E. W. Abbott, Company cashier, testified that "these peddlers" can use their own equipment if they want to, or they can pay five cents per hundred pounds for horse and wagon. If Company facilities are utilized, the five-cent differential is transferred to a work sheet for book-keeping purposes and is finally entered as expenses. Work sheets show the tonnage each man receives. When asked whether the Company kept a record "of what [the delivery men] pay in to you," Abbott replied: "No, sir. We only keep a record of the individual tonnage—we keep a record on the revenues. . . . The only thing we have is what we sell the ice for. We know how much money we take in in a day. We have no payroll sheets, nothing to show whether the distributors have assistants, or how much is paid them."

Continuing his testimony, Abbott explained that the Company used two types of coupon books, one for wholesale and one for retail trade. These were sold on the basis of 35c and 40c per hundred pounds of ice and handled as money. They may be had by anyone, and in the matter of selling them, "The drivers make the deals," or perhaps half of the books are sold that way. If a driver misses a customer there is usually a complaint. This information is transmitted to the driver, who is then supposed to deliver. The wagons are serially numbered and

have printed on them, ''Ice Service Company.'' Customers may purchase ice by calling at the Company's platform, where the retail price is 40c—the same as that charged by delivery men. All of the route men sold for the same price, although, said Abbott, ''We have reason to believe that the distributor had the right to sell for anything he wanted to.''

Henry Jones, one of the drivers who used Company equipment, testified he had been employed about thirty years, occasionally serving in the loading cage, ''but if the driver was off I would run his route, because I was acquainted with all of them.'' When asked why he joined the strikers in 1940, Jones replied, ''I didn't strike for anything—the white folks struck. I didn't know anything about it. They say we all walk out, and so I goes home. . . . After that the [Company] man said if we could get a truck or use their wagons we could sell ice. . . . I guess they told me where to work, [but] I couldn't sell ice anywhere.'' The Company supplied cards showing prices. These were procurable at the platform, and were used ''so the people who bought ice wouldn't think they were getting 'gipped'.'' They were marked, ''Ceiling price forty cents.''

Fred Morgan, another driver using Company equipment, testified that he sold ice at 41c per hundred, adding a penny to cover sales tax. The witness said he ''sometimes'' paid the tax, and ''sometimes'' didn't—''I had been paying the tax to Mr. Abbott, but I haven't paid any in quite a while.'' Morgan was not with the Company when the strike occurred, but had previously worked for it. After the strike he ''made a trade'' with Sam Cook, manager. Cook assigned a route to Morgan—one he was familiar with—and deliveries were begun. Later the territory so assigned became ''too heavy'' for Morgan, who informed Cook of that fact. Cook replied, ''I will put another [wagon] out there.'' Cook told Morgan ''to find someone and send him in.'' This occurred in April.[2] A nineteen-year-old boy was procured, and the route was divided. Louie Galloway, route foreman (not now with

---

[2] Hearing by the Board of Review was had November 21, 1945. The opinion is dated January 11, 1946.

the Company) divided the route, assigning respective territories. When Galloway quit his place was not filled.[3]

Other testimony given in substantiation of the Company's contention that the men were independent contractors was virtually the same as that quoted.

The City of Pine Bluff levies an occupation tax of $100 a year "for the privilege of peddling ice." This is paid by the Company. In addition there is a charge of $5 for use of wagons, referred to in the testimony as a license-tag fee. It was conceded that the Company paid this assessment on each of its wagons and that the charge was not extended against the individual drivers.

Although the delivery men are required to call at the Company's storage plant and receive ice according to their requirements, the Company maintains a replacement service and delivers to wagons *en route* when the retail supply is exhausted. No charge is made for these sub-deliveries.

Fred Washington, another driver, testified that in some instances he accepted coupons for cash; that coupons entitled customers to receive ice at 35c per pound, and he did not question the transactions, since customers procured coupon books from the Company.

All wagons and horses supplied by the Company were maintained and serviced by it. Drivers merely return the equipment to Company custody when daily work on the routes has been completed.

Appellant insists that affirmance of the judgment here will necessarily impair or overrule the *Crossett Lumber Company-McCain* case, and the decision in *Moore, etc.,* v. *Phillips,* heretofore referred, and holdings of like import. The suggestion is not sound. Logging,

---

[3] Morgan's testimony shows that Galloway, as route foreman, exercised certain supervisory acts, but the record does not clearly disclose when he quit. However, it was "sometime last year—he left for the Army." The inference is that Galloway served the Company long after the 1940 strike; and, as explained by Morgan, his duties were "hiring of the crowd; and [he] was in charge of the wagons." Question: "Did he go out on the route with you?" A. "Yes, Sir. Every day you would see Mr. Louie. He would talk with us about deliveries."

*per se,* is an independent profession. Reported cases disclose that scores of substantial individuals and organizations having no interest directly or indirectly with mills that use forest products, are engaged in timber-moving activities. In those cases we have held that an independent relationship may be created, subject to strict examination as to motives where there is evidence that subterfuge might be profitable to one of the parties.[4] But it has never been held that an imperative part of a principal transaction—a part intimately related to final objective, as in the instant case,—can be arbitrarily lifted from its normal position as a necessary link between purpose and result, and then treated as a wholly disconnected transaction in respect of which the principal is not concerned with means or method, and exercises no control.

*Ice Service Company* v. *Forbess,* 180 Ark. 253, 21 S. W. 2d 411, is in point, the primary distinction being that in the case at bar we are dealing with taxation as distinguished from an action to compensate personal injuries occasioned through negligence. It was held in circumstances similar to appellant's present contention that the relationship of master and servant existed, and judgment for $4,000 was sustained.

Affirmed.

---

[4] There is no suggestion in this case that the plan of delivery was adopted as a means of evasion.