McCain, Commissioner of Labor, *v.* Crossett Lumber Company.

4-7162                                          174 S. W. 2d 114

Opinion delivered July 12, 1943.

*Luke Arnett,* for appellant.

*Williamson & Williamson,* for appellee.

KNOX, J. This case (hereinafter called present case) is a companion case to *Crossett Lumber Co.* v. *McCain,* 205 Ark. 631, 170 S. W. 2d 64, (hereinafter called former case). The parties have stipulated that the evidence in that case, together with some additional evidence, might serve as the bill of exceptions here. Appel-

lants, at times may be designated ''Commissioner,'' and appellee designated ''Crossett.''

In order to properly define and dispose of the issues in the present case, reference to, and perhaps quotations from, the statement of facts set out in the former case may be necessary, but in an effort to achieve brevity the whole of such statement is incorporated herein by reference, and attention is directed thereto.

The former case was begun on July 9, 1940, when Robert E. Linder, and various other timber cutters, filed their separate claims for unemployment compensation benefits, basing their demands upon allegations that they were employees of Crossett. Linder and the others had been engaged in cutting timber which belonged to, or which was destined for manufacture in the mills of Crossett, but each of them had been hired by and worked under and for men who Crossett contended were independent contractors. Crossett, therefore, contended that these claimants were not its employees, and that such benefits, if allowed, should not be chargeable against it.

Prior to the filing of such claims for benefits Crossett had regularly paid unemployment benefits covering men directly employed and paid by it, but had not reported or paid on compensation paid these independent contractors, or the wages of the men who were hired by and worked under them.

After the claims of Linder and others were filed, Crossett at first took the view that it had no interest in the matter, but upon being advised that the allowance of the claims to these persons as employees of Crossett would establish its liability for the tax, it thereafter assumed the burden of a party to the litigation.

While the former case was still pending, and before there had been a final determination of the question as to what relationship, if any, existed between Crossett and the timber cutters, the office of the Commissioner of Internal Revenue, in Washington, elected to decide that question for itself, and ruled that these timber cutters, and contractors as well, were in fact the servants of Crossett, and that Crossett was liable for unemploy-

ment compensation tax based upon payments made to such contractors.

On November 27, 1940, the Unemployment Compensation Division of the State Department of Labor forwarded to all lumber companies in Arkansas a circular letter advising them of the ruling of the Commissioner of Internal Revenue, and in that letter said: "Under the terms of the Second Revenue Act of 1940, § 701, which was effective October 8, 1940, employers are allowed sixty (60) days after the date of the enactment of the act in which to pay contributions to State Unemployment Compensation Funds for the years 1936, 1937, 1938 and 1939 and receive credit therefor against the Federal Unemployment Compensation Tax. The sixtieth day is December 6, 1940, and unless such contributions are made not later than that date, then employer will be required to pay the state and will also be required to pay the full tax to the federal government without credit for payments that will eventually have to be made to the state agency anyhow."

Other paragraphs in the letter made demands for the payment of the state tax on or before December 6, 1940, and emphasized the fact that unless it was paid to the state by that date the companies would be required to pay the full amount twice, once to the federal government and once to the state government.

Although no court had declared these timber cutters to be its employees, and, although Crossett was at that time contending they were not, (a contention which was finally sustained by this court), Crossett, nevertheless, found itself in a position where if it refused to pay and it was thereafter determined that such persons were its employees within the meaning of the then existing unemployment compensation law its liability would be doubled. As a result of this gentle persuasion, Crossett elected to pay, but not without an effort to reserve the question and protect its rights.

After some conferences between representatives of Crossett and the Unemployment Compensation Division, Crossett tendered payment by check, which bore the in-

dorsement ''Paid Under Written Protest.'' This check was enclosed in a letter which set out in detail the basis of the protest referred to. We quote from said letter as follows: ''This payment is made solely as a matter of precaution, by reason of your aforesaid demand and said credit provision of § 701 (a) of the Second Revenue Act of 1940.

''Crossett Lumber Company reserves all rights to recover the payment herewith made, or to take credit for it upon any taxes or contributions that may hereafter become legally due, and particularly reserves its rights to such refund or credit in accordance with § 14 (d) of the Arkansas Unemployment Compensation Law as amended, or any other provisions of law now or hereafter in force, and particularly pursuant to the agreement, rules, regulations and stipulations made by you in connection with or relative to this payment.''

At the same time a written agreement was entered into between the Commissioner and Crossett. Such agreement set out the history and nature of the controversy, recognized the good faith of Crossett throughout, acknowledged that the payment so made and accepted was not to be considered a closed transaction, but that such payment was made under protest, and only for the purpose of avoiding the penalties of, and to obtain credit under, § 1600 of Internal Revenue Code, and then recited: ''It is further agreed that the Commissioner of Labor under the authority vested in him by law does hereby adopt a special rule with respect to said company and with respect to the demand for payment of unemployment contributions upon the remuneration of the individuals herein mentioned to the effect that the due date of said contributions is and shall be the date of this instrument, and the company hereby acknowledges receipt of notice of said special rule for the required ten days.

''It is further agreed and understood that the said company will within one year file an application for refund of the entire amount paid and that said application will be received by the Commissioner and will be passed

upon by the Commissioner upon the merits thereof; and it is further agreed that, if the Commissioner should deny said application for refund and his denial should be contested in the courts, no contention will be made by the Commissioner that the application for refund was not made in due time.''

Immediately following such payment under protest, Crossett filed its complaint in the present case seeking a return of the money. The parties were of the opinion that all questions involved in both cases could be and would be determined in the final decision of the former case, and for that reason attorneys on both sides, tacitly at least, consented that the present case should be held in abeyance, and the former case pressed in the belief that both cases would be thereby determined. In the course of his oral argument before this court in the former case, the attorney for Crossett stated without objection by attorneys for the Commissioner that it was the desire of all parties that all questions, including the tax liability, be decided in that case.

In accordance with what appeared to be the desire of the parties, we sought to completely dispose of the controversy and decide all issues in the opinion rendered in the former case, and with respect to the question as to whether or not Crossett was liable for this tax we said, ''It necessarily follows that appellant (Crossett) is neither the employer nor the employing unit of claimants *and that it cannot be required to pay a social security tax on persons not in its employment.''* 205 Ark. 631, 170 S. W. 2d 69.

We thus sought to express the conclusion which we had reached, that under either the existing or the prior statute Crossett in the past had not been, was not then, and in the future would not become, on account of wages earned by timber cutters who were employed and performed services in the manner and under conditions and circumstances disclosed by the record in that case, liable for unemployment benefit assessments.

After the decision in the former case, Crossett requested the Commissioner to refund these taxes, which

had been paid under protest, and, although the Commissioner admittedly has authority under § 14 (d) of act 391 of the Acts of 1941 to make refunds or allow credits in cases where he finds benefit assessments have been erroneously paid or collected, the Commissioner failed to grant Crossett's application, whereupon the present case was revived and heard in the trial court, resulting in a judgment requiring the Commissioner to refund these moneys.

In the opinion rendered in the former case it is said: "The National Social Security Act was enacted by Congress in 1935, 42 USCA, § 301, *et seq.* Arkansas entered the field in 1937 by the enactment of act 155 of 1937 known as Unemployment Compensation Law. This act was amended by act 200 of 1939. In 1941 the Legislature repealed both former acts by Act 391 of that year and enacted what it designated in § 1 as the 'Arkansas Employment Security Act'."

Then followed a statement of how the claims of the timber cutters arose, a chronological history of the various proceedings taken in connection with the prosecution of such claims, accompanied by references as to which act was in force on the date each step was taken, or proceeding had in the matter. It was then stated: "We are convinced that the correctness of this decision must be determined under the provisions of act 391 of 1941, and that act 155 of 1937 and its amendatory act 200 of 1939 *cannot be considered for any purpose.*"

The court, therefore, proceeded to dispose of the issues, including the question of tax liability, in accordance with the legislative intent as derived from a construction of act 391 of 1941.

The Commissioner now contends that the question whether such tax was erroneously collected was not settled by the former decision. His position is stated in briefs filed on his behalf as follows: "In the case at bar, the question involves the payment of tax which was levied pursuant to the provisions of Act 155, as amended, and all of which accrued during the time Act 155, as amended, was in force and effect. No part of this tax involved in

this case is for a period of time subsequent to the effective date of Act 391.

"Therefore, it is the position of appellants that this case must, of necessity, be determined under act 155, as amended, and the liability of the Crossett Lumber Company for such tax must be determined pursuant to the provisions of said act 155, as amended."

The statement in the former case to the effect that act 155, as amended, "cannot be considered for any purpose," is, we think, sufficient answer to appellants' contention here. In so far as the question of tax liability is concerned, however, the result is the same whether tested under the provision of act 155 of 1937, as amended, or under act 391 of 1941—Crossett was at no time liable for this tax under the provisions of either act.

The record in the former case disclosed that one Robert E. Linder, a timber cutter, had worked for Walter Holland, a contractor, from January to April, 1939, and that said Linder had worked for Ben Allen, another contractor, from June 6, 1939, to December 31, 1939, and by consent of the parties in that case the circumstances surrounding the employment of Linder was accepted as representative of the circumstances surrounding the employment of all other timber cutters, and the relationship existing between Crossett and Holland and Allen was accepted as representative of the relationship existing between Crossett and all other contractors.

The record in the former case is used as the record here, and in addition it is stipulated that "if it should be adjudicated that Holland and Allen were at the time independent contractors, . . . the plaintiff should be entitled to recover in this action. On the contrary, if the court finds that in law or in fact said Holland and Allen were at the time employees of the plaintiff, Crossett Lumber Company, then judgment should be rendered for the defendants."

The words "at that time" found in the language above quoted refer to the time these taxes were paid under protest, to-wit: December 3, 1940, which was prior to the adoption of act 391 of 1941 and while act 155 of

1937, as amended, was still in effect. It is argued, therefore, that unless Allen and Holland were independent contractors under the provisions of act 155, as amended, then the taxes were collected in accordance with the provision of the then existing law, and, therefore, should not be refunded.

In the former case it was expressly held that both under the common law and under the provisions of act 391 of the Acts of 1941 Allen and Holland were independent contractors. Appellants contend that they could not have been so classified under act 155 of 1937, as amended, and in support of this contention cite § 2 (5 A, B and C) of said act, which is § 8550 (5 A, B and C) of Pope's Digest, which reads in part as follows:

"(5) Services performed by an individual for wages shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the Commissioner that . . . ;

"(A) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact, and . . . ;

"(B) Such service is either outside the usual course of business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) Such individual is customarily engaged in an independently established trade, occupation, profession or business."

Appellants contend that before either Allen or Holland could be held to be independent contractors the record would have to disclose (which it does not) that each and every condition mentioned in paragraphs A, B and C existed.

This argument ignores the first and controlling paragraph of this sub-section 5 which is "Services performed by an *individual* for *wages* shall be . . . subject to the act . . . unless;" Then follows para-

graphs A, B and C, which constitute the exceptions. Paragraphs A, B and C can have no application, and, therefore, construction of the provisions thereof are unnecessary, except in cases where the three precedent conditions are first found to exist, to-wit: (1) that services were performed; (2) by an individual; (3) for wages.

The word services is not defined in the act. The Legislature could have used it in the narrow sense of "personal service," or in a more comprehensive sense. We find it unnecessary to decide the question. The fact that the service must be rendered by an individual strongly indicates that personal service was intended. The third condition, however, completely forecloses the question. The service must be performed for "wages." Now the term wages is defined by the act itself in the following language; " 'wages' means all remuneration payable for personal service. . . ."

Therefore, since at common law Allen and Holland were independent contractors they would be held to be such under the provisions of act No. 155, as amended, unless the remuneration paid them by Crossett was paid for their personal service. The record wholly fails to disclose any such condition. On the contrary it shows that these men owned trucks, tools and equipment suitable for the cutting and hauling of timber—that they entered into written contracts with Crossett for the cutting and hauling of timber. They hired and fired their own crews, and fixed and paid their wages themselves. Some of these contractors often had two or more crews working at the same time. The contractors were not always present with their crews, and personally did little of the actual physical labor connected with the cutting or hauling of the timber. The remuneration paid them by Crossett were not compensation for their personal services nor in fact reimbursement for moneys paid out for the personal service to their employees. The remuneration paid by Crossett were the agreed contract price, based upon the amount of timber which the contractor actually delivered to the mill site. If, in any week, the contractor had paid out for wages for his men and for replacements, repairs and upkeep of his trucks and other

expenses more than he received from Crossett for timber delivered, the loss was his. If he received more from Crossett than he paid out for wages, upkeep, replacements, repairs and expenses, the profit was his. One whose income is determined by the profit or loss which he derives from his individual business cannot be said to be rendering "services for wages," even though he is contributing his personal services to the enterprise.

We conclude, therefore, that at the time these taxes were paid, under protest, and while act No. 155 of 1937, as amended was in effect, Allen and Holland were independent contractors, notwithstanding the provisions of § 8550 (5) of Pope's Digest.

While we entertain no serious doubt as to the correctness of the conclusion announced in the preceding paragraph, it might be well to observe in passing that in construing an act imposing a special tax, such as we have here, we must construe the same strictly against the state and favorably to the taxpayer, and all ambiguities or doubts therein respecting liability for such tax must be resolved in favor of the taxpayer. *Wiseman* v. *Ark. Utilities Co.,* 191 Ark. 854, 88 S. W. 2d 81; *Hardin* v. *Ft. Smith C. & B. Co.,* 202 Ark. 814, 152 S. W. 2d 1015.

The views herein expressed are in no way in conflict with the decision in the case of *McKinley* v. *R. L. Payne & Son Lbr. Co.,* 200 Ark. 1114, 143 S. W. 2d 38.

The effect of that decision is that regardless of the artful devices which were employed to create the illusion that he was an independent contractor, Bailey, the person whose status was there in question, was, both at common law and under this statute, nothing more nor less than a mere foreman. Under those circumstances he and those working under him were individuals rendering a personal service for wages and, therefore, the true employer was properly chargeable with the tax.

Counsel raise no question relative to whether this is such a suit as is prohibited by art. V, § 20 of the Constitution, which provides that the State "shall never be made a defendant in any of her courts."

Neither the trial court nor this court acquires jurisdiction in a case where the pleadings show that the suit

is in effect one against the State. *Pitcock v. State,* 91 Ark. 527, 121 S. W. 742, 134 Am. St. Rep. 88. Since jurisdiction of the subject-matter cannot be conferred by consent of the parties, the question, even though not raised by the parties, is always open. It presents itself, and must be determined by the court. *Price v. Madison County Bank,* 90 Ark. 195, 118 S. W. 706. The court has, therefore, considered the question as to whether it lacks jurisdiction in this case on account of the constitutional prohibition above mentioned.

The fact that a state officer instead of the State itself is designated as the party defendant does not foreclose the question, for if the State is in fact the real party in interest, then the suit falls within the constitutional prohibition. *Jobe v. Urquhart,* 102 Ark. 470, 143 S. W. 121, Ann. Cas. 1914A, 351; *McConnell v. Ark. Brick Mfg. Co.,* 70 Ark. 568, 69 S. W. 559; *Pitcock v. State,* 91 Ark. 527, 121 S. W. 742, 134 Am. St. Rep. 88; *Allen Engineering Co. v. Kays,* 106 Ark. 174, 152 S. W. 992; *Ark. State Highway Commission v. Partain,* 193 Ark. 803, 103 S. W. 2d 53; *Page v. McKinley,* 196 Ark. 331, 118 S. W. 2d 235.

Section 14 (d) of Act 391 of 1941 (a similar section having been included in Act 155 of 1937) authorizes the Commissioner, after he "shall determine that payment of . . . contributions . . . were erroneous" to allow the employer "to make an adjustment thereof . . . in connection with subsequent payments . . . (and) if such adjustment cannot be made the Commissioner may refund . . . the amount erroneously paid."

The act does not authorize judicial review of the actions taken by the Commissioner under this section.

Section 9 of Act 391 of 1941 defines and prescribes the method of administering the "Unemployment Compensation Fund," which is derived largely from the payment of contributions by the employers. An almost identical provision was included in Act 155 of 1937. Paragraph (b) of said § 9 requires the Commissioner to designate a treasurer and custodian of the fund, and

requires such person to "maintain within the fund three separate accounts; (1) a clearing account, (2) an unemployment trust fund account, and (3) a benefit account." Collections are first deposited in the clearing account and refunds allowed by the Commissioner under § 14 (d) of the act are payable from the clearing account. At the times and in the manner as in that section provided funds are transferred to the other two accounts which are deposited with the Secretary of the Treasury of the United States.

The majority of the court have reached the conclusion (in which Mr. Justice Robins, Mr. Justice McFaddin and the writer do not concur) that in view of the facts reflected by this record, and particularly the facts that (a) the payments were made under protest, and (b) that both the Commissioner and Crossett understood that it was not a closed transaction, but that the validity of the assessment would be contested, and (c) that a written agreement was entered into at the time, which recognized that this suit would be brought, and (d) that the Commissioner has in this case specifically stipulated that "if it should be adjudicated that Holland and Allen were . . . independent contractors the . . . plaintiff should . . . recover . . .," all taken together is sufficient to justify the inference that the moneys so paid to the Commissioner by Crossett under protest, at no time were mingled with or became a part of the funds of the State, but that the Commissioner accepted, and has since held the same, in the capacity of a trustee or escrow agent for the parties, subject to the adjudication of Crossett's liability for such taxes. The majority holds that under such circumstances the suit is not against the State.

Affirmed.

Robins, J.; dissenting. I dissent from the majority opinion on the following grounds:

I. This case is controlled by Act 155 of 1937, rather than by Act 391 of 1941, and, under the provisions of Act 155, as construed in the case of *McKinley, Commissioner of Labor,* v. *R. L. Payne & Son Lumber Company,*

200 Ark. 1114, 143 S. W. 2d 38, the services involved were those of employees and not independent contractors.

II.   This suit is in reality against the state, and, as such, is forbidden by the constitution of Arkansas.

## I.

In the trial of the case at bar, no evidence was heard, but it was agreed that it should be determined upon the evidence adduced in the case of *Crosstt Lumbr Company* v. *McCain, Commissionr,* 205 Ark. 631, 170 S. W. 2d 64. The question in that case was whether certain timber cutters engaged in cutting and logging timber on lands of the Crossett Lumber Company to supply timber to the mills of the Crossett Lumber Company were employees of the Crossett Lumber Company, within the meaning of the Unemployment Compensation Law, or were employees of independent contractors of the Crossett Lumber Company.

This court, in the case of *Crossett Lumber Company* v. *McCain, supra,* set forth at length the findings of fact by the Industrial Board, which had been adopted by the circuit court, the correctness of which findings is not challenged, as follows:

"There are numerous individuals who operate under written agreements with the company and in most instances identical; that said contracts were made for a period of one year unless sooner canceled by the parties, each of which had a right to cancel same without cause upon three days' notice.  The company employs district supervisors who are in charge of operation on respective tracts of land and these employees have entire supervision over all of the forests and over the individuals who cut and remove timber therefrom.  The supervisor makes the contracts for and on behalf of the lumber company with the individuals to cut and remove said timber and designates the timber for them to cut and remove, has full control over the quantity of timber cut and removed under said contract, and in some instances exercised control over the claimants who were cutting and removing said timber.  It is the duty of the supervisor to see that the contract is complied with and to move the timber cut-

ters from place to place at will. The supervisor had full control over the amount of time worked by the timber cutters and controlled the amount of timber cut and delivered and to stop the work entirely at the pleasure of the lumber company. There was never any discussion with reference to the making of the agreements between the company and contractors. The contractors were required to sign them by the supervisor who presented them to them for their signature. Most of the contractors never read the contract. The company changed the type of contract used by them in 1940. The new form provided that the owner should have no control over the contractor. There was no change in the operation and the methods by the company at the time it changed its contracts, but the work was carried on in the same manner in which it had been carried on for a number of years.''

The testimony showed that these timber cutters were hired by Walter Holland, who had been employed by the Crossett Lumber Company under a written contract. It is contended that the relation of owner and independent contractor was created between the company and Holland, by this contract, which is as follows:

''Whereas, Crossett Lumber Company of Crossett, Arkansas, hereinafter called ''owner,'' is the owner of certain timber lands from which it is desired that certain of the forest products thereon be cut and delivered to it as provided herein; and whereas, Walter Holland, of Hamburg, Arkansas, hereinafter called 'contractor,' is engaged, or is equipped to engage, in the business of cutting and hauling forest products upon a contract basis; it is therefore mutually agreed between the parties as follows: 1. Beginning on or about July 19, 1940, the said contractor is to cut from the following described lands: Crossett Lumber Company lands in east block, Ashley county, Arkansas, only the following forest products: Chemical wood of such kind, grade, length and size as, from time to time, may be specified by the owner, the same to be delivered to the owner at the following location: Crossett Lumber Company logging railroads at the rate of not less than 25 parcels nor more than 150 parcels

during each week of the term of this contract. 2. Contractor agrees that all such forest products shall be cut and handled without unnecessary waste, and without unnecessary damage or injury to timber left standing: the work to be done in a workmanlike manner which shall be *(in the opinion of the owner)* in accordance with sound practices of timber conservation and reproduction, as advocated by federal and/or state authorities: owner shall have no control over contractor—but contractor, exercising an independent employment, will do the work according to his own methods, without being subject to control of owner, except as to the result of the work to be done. 3. The owner agrees to pay the contractor upon delivery, but not more frequently than once each week, for all of said products cut and delivered under this contract, according to the owner's current published rate schedule in effect at date of delivery. 4. The contractor agrees that this contract shall be revocable by the owner immediately upon written notice if at any time the said contractor shall fail to furnish to the owner, whenever requested by the latter, satisfactory evidence that the said contractor has complied with all state and federal laws and regulations (including, but not limited to, the Fair Labor Standards Act of 1938), now or hereafter in effect, the violation of which by the said contractor would subject the owner to any liability or responsibility. The contractor further agrees, at the request of the owner, to present for inspection at the office of the owner, his books, records and other documents relating to the wages and hours of his employees. 5. This contract shall remain in force for a period of one year from the date hereof, *unless sooner canceled at the option of either party by three days' written notice to the other party mailed to him or it at his or its last known postoffice address.''*

This contract, while apparently designating Holland as an independent contractor, contains two provisions which tend strongly to negative this relation: The contract provides that the Crossett Lumber Company may discharge the so-called independent contractor at any time; and it provides that all of the work is to be done ''in accordance with sound practices of timber conserva-

tion and reproduction," as finally determined by the opinion of the Crossett Lumber Company.

The general rule is that to establish the relation of "owner" and "independent contractor" it must be shown that by the contract of employment the "independent contractor" is permitted to do the work in his own way and without any control by the employer as to methods of work.

What more effective control over the methods of work could be retained by the employer than the right to terminate the employment at any time? It is idle to say that the employer could not control the methods, of work when, under the contract of employment, the employer could discharge the contractor at any time. No more effectual means of control of the methods of work could possibly be put in the hands of the employer than to give him the right to discharge without cause a so-called "independent contractor" at any time.

"The power of an employer to terminate a contract at any time, irrespective of whether there is or is not a good cause for so doing, is indisputably an evidential element which tends strongly to show that the person employed is not an independent contractor. There is even some authority for the doctrine that the probative force of such power is virtually decisive." 27 Am. Jur., p. 501.

In the case of *Frost* v. *Blue Ridge Timber Corporation,* 158 Tenn. 18, 11 S. W. 2d 860, the Supreme Court of Tennessee said: "In *Odom* v. *Sanford & Treadway, supra* (156 Tenn. 202, 299 S. W. 1045), this court quoted with approval from Ruling Case Law (vol. 14, p. 67): 'In this connection, the ultimate question is not whether the employer actually exercises control over the doing of the work, but whether he has the right to control.' And again 'The power of an employer to terminate the employment at any time is incompatible with the full control of the work which is usually enjoyed by an independent contractor, and hence is considered as a strong circumstance tending to show the subserviency of the employee. Indeed, it has been said that no single fact is more conclusive, perhaps, than the unrestricted right of the em-

ployer to end the particular service whenever he chooses, without regard to the final result of the work itself.' 156 Tenn. 210, 299 S. W. 1047, quoting from 14 R. C. L., p. 72. The two circumstances mostly relied upon by the employer to place Frost in the status of an independent contractor are the fact that he was paid according to the amount of work done, and the fact that the employer's superintendent did not exercise control over the amount of work done. These circumstances are not conclusive, as is clearly indicated by the authorities cited, since they do not exclude the employer's right to control or to terminate the employment at will.''

The Supreme Court of Maine, in *Murray's Case,* 130 Me. 181, 154 A. 352, 75 A. L. R. 720, said: ''Our court has said in *Dobson's case, supra* (124 Me. 305, 128 A. 401, 42 A. L. R. 603), that the right to discharge the employee at will is not, taken alone, the decisive test as to whether or not he is an independent contractor, but that fact strongly tends to establish the relationship. 'The power of an employer to terminate the employment at any time is incompatible with the full control of the work that is usually enjoyed by an independent contractor.' *Bowen* v. *Gradison Construction Co.,* Oct., 1930, 236 Ky. 270, 32 S. W. 2d 1014. 'No single fact is more conclusive as to the effect of the contract of employment, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of the work itself.' *Cockran* v. *Rice,* 26 S. D. 393, 128 N. W. 583, Ann. Cas. 1913B, 570. 'The power to discharge has been regarded as the test by which to determine whether the relation of master and servant exists. While it is not the sole test, it is the best test upon the question of control.' *Messmer* v. *Bell (& Coggeshall Co.),* 133 Ky. 19, 117 S. W. 346, 19 Ann. Cas. 1. 'By virtue of its power to discharge, the company could, at any moment, direct the minutest detail and method of the work. The fact, if a fact, that if it did not do so is immaterial. It is the power of control, not the fact of control, that is the principal factor in distinguishing a servant from a contractor.' *Franklin Coal & Coke Co.* v. *Industrial Comm.,* 296 Ill. 329, 129 N. E. 811. 'The most im-

portant point 'in determining the main question (contractor or employees) is the right of either to terminate the relation without liability'." *Industrial Comm.* v. *Hammond, supra* (77 Colo. 414, 236 P. 1006); *Industrial Comm.* v. *Bonfils,* 78 Colo. 306, 241 P. 735; *Barclay* v. *Puget Sound Lumber Co.,* 48 Wash. 241, 93 P. 430, 16 L. R. A., N. S. 140; *Nyback* v. *Champagne Lumber Co.,* (7 Cir.) 109 F. 732; *Evans* v. *Dare Lumber Co.,* 174 N. C. 31, 93 S. E. 430, 30 A. L. R. 1498."

In sustaining the finding of the lower court that one Bashko, a timber cutter, who furnished his own tools and worked on a piecework scale, was a servant and not an independent contractor the Supreme Court of Minnesota, in the case of *State ex rel.* v. *District Court,* 128 Minn. 43, 150 N. W. 211, said: "They (the employers) had the right to discharge him at any time, and this right afforded adequate means for controlling the work."

In *Kelley's Dependents* v. *Hoosac Lumber Company,* 95 Vt. 50, 113 Atl. 818, it was shown that Kelley and Beers made a contract with the company to cut and haul logs at $12 per thousand. Their contract ran for no particular period, but could be terminated at any time. Kelley and Beers furnished teams and drivers, but the company furnished tools. It was held by the Supreme Court of Vermont that Kelley was an employee, and not an independent contractor.

In *Sempier* v. *Goemann, et al.,* 165 Wis. 103, 161 N. W. 354, Ann. Cas. 1918C, 670, it appeared that Sempier was paid by one Cherf, who had a contract to pile logs for a certain price per thousand. It was nevertheless held in that case that Cherf was not an independent contractor and that Sempier was the employee of the person who had the general contract for this work.

In *Evans* v. *Dare Lumber Co.,* 174 N. C. 31, 93 S. E. 430, 30 A. L. R. 1498, Spruill was operating a lath room for the company for 60 cents per 1,000 laths made. He selected, hired and paid all his helpers. Under Spruill's contract with the company, the company could terminate his employment at any time. In that case the court said: "In this case the employer had power to terminate

Spruill's employment at any time. This gave the defendant potential control over him, and is conclusive that Spruill was not an independent contractor, for whose negligence the defendant was not responsible. It is said in 14 R. C. L. 72, that it is idle and vain to assert that an employee is an independent contractor because he has the sole right to hire and discharge his help when his own employer has the unquestioned right to terminate the contractor's employment at will.''

But the parties to the contract under consideration here were not content to leave the control of mehods of work dependent on the right of the employer to discharge, but they went further and in plain English stated that the work should be done ''in a workmanlike manner which shall be *(in the opinion of the owner)* in accordance with sound practices of timber conservation and reproduction, . . .'' In other words, under this contract, the opinion of the owner controls finally and absolutely on any question arising as to the manner in which these workmen were carrying on their cutting and logging operations.

The parties entered into a written contract the language of which unmistakably proclaims the relation created to be that of master and servant, and the fact that the contract declares that the relation created is that of owner and independent contractor should not be determinative. The relation actually created by the contract, rather than the name arbitrarily conferred on the relation by the draftsman of the contract, should govern.

When this question was before the court in the case of *Crossett Lumber Company* v. *McCain, Commissioner, supra,* the majority of the court held that the relation was that of independent contractor, and justified this holding on the ground that the case was controlled by the provisions of Act 391 of 1941, which was said to be retroactive. The claim involved was filed on July 9, 1940, covering unemployment which had occurred prior to that date, and the claim was heard by the Appeals referee on June 5, 1941, all done before the effective date of Act 391 of 1941, which was July 1, 1941.

Act 391 changed subdivisions (A), (B) and (C) under § 2 (i) (5) of Act 155 of 1937 so as to use the disjunctive "or" instead of the conjunction "and" in connecting these subdivisions, and by adding the following at the end of subsection (C): 'provided, however, this act shall be construed to apply only where the legal relationship of master and servant exists; and independent contractors, as defined by the common law of the state, shall be deemed employers, or the employing unit, and not employees; the foregoing definition governing employment relationship shall apply solely for the purpose of the administration of this act and for no other purpose. The statutory employee created by this act shall not abrogate the common law definition of master and servant as the same applies in actions in tort, nor shall the supervision and control required for the purposes of this act to be exercised by an employing unit over said statutory employees be admissible in actions in tort."

In discussing this change the majority of the court, in the case of *Crossett Lumber Company* v. *McCain, Commissioner, supra,* said: "This provision of Act 391 was no doubt enacted to correct or amend our opinion in *McKinley* v. *Payne & Son Lumber Co., supra,* where language was used which appears to have been unnecessary to a decision of the case, to the effect that the statutory (A), (B), (C) definition of an independent contractor was broader than the common-law concept thereof. We do not mean to impair or overrule the holding in that case that the employee, Bailey, was not an independent contractor. Under the facts in that case he was an employee. Whether such was the purpose, it is now made clear and certain that 'independent contractors, as defined by the common law of the state, shall be deemed employers, or the employing unit, and not employees.' "

In my dissenting opinion in the case of *Crossett Lumber Company* v. *McCain, Commissioner, supra,* I endeavored to point out that in view of § 13284 of Pope's Digest it was clearly the intention of the legislature, in enacting Act 391 of 1941, not to make it retroactive as to claims arising, or proceedings instituted, under Act 155 of 1937.

In the case at bar the majority of the court, in dealing with the relationship of the same parties and with the status of the same service as was under consideration in the case of *Crossett Lumber Co.* v. *McCain, supra,* apparently abandons the position taken in the former case and agrees with the writer that the question of the character of the relationship that existed between these parties must be determined under Act 155. Nor does the majority now overrule the opinion in the case of *McKinlay* v. *R. L. Payne & Son Lumber Co.,* 200 Ark. 1114, 143 S. W. 2d 38, but allows it to stand and attempts to distinguish the facts in that case from those in the one at bar. An examination of the testimony will disclose that there is no substantial difference between the facts as to the relation of the parties in that case and in the instant case.

In the McKinley case, the Commissioner of Labor was attempting to collect from R. L. Payne & Son Lumber Company unemployment contributions covering certain workmen who, according to the contention of the lumber company, were not employed by the lumber company but were employed by George Bailey, an independent contractor. The lower court enjoined the collection of the tax, holding that the employees of Bailey were not in reality the employees of R. L. Payne & Son Lumber Company and that the lumber company was not liable for the unemployment tax based on their employment; but this court reversed the decree of the lower court and declared that Bailey was not an independent contractor and that his workmen were in reality employees of the lumber company. The testimony showed that the lumber company had made a contract with Bailey to move the lumber from the mill where it was being produced out on the yard and to stack it there; that Bailey hired and discharged his own men; that the manager of the mill did not exercise any control over Bailey's men, but if there was any complaint about the method of stacking the lumber he would go to Bailey about it; that Bailey kept the time of his men and turned it over to the company's bookkeeper, and the amount paid these men was deducted from the amount payable to Bailey. This court, in its opinion in that case, said:

"*While Mr. Payne calls Bailey an independent contractor*, the evidence conclusively shows that he was a mere employee, and that Payne had the right not only to control him so as to prevent lumber being blocked, but had the right to discharge him. But whether he would be classed as an independent contractor under the common law, we think, is immaterial because under the Unemployment Compensation Act he was an employee. Section 8550 of Pope's Digest provides that the term 'employment,' subject to the other provisions of this subsection, means 'service, including service in interstate commerce performed for wages or under any contract of hire written or oral, express or implied.' Said section also provides: 'Services performed by an individual for wages shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commissioner that: (A) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact, and (B) Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.' It cannot be contended that under the evidence in this case Bailey was free from control or direction over the performance of his services, both under his contract of service and in fact. But even if that were true, it would have to further appear that such service is either outside of the usual course of business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed, and that is not shown. In addition to that, it would have to appear that Bailey was customarily engaged in an independently established trade, occupation, profession or business, and the evidence does not show this. In dicusssing a statute similar to ours, the Supreme Court of Utah said: 'Section 19 is a section on definitions and provides a glossary which pertains to the act.

These definitions may differ from the common-law concepts designated by the same words. The above quoted section 19 (j) (5) signifies a relationship entitled to benefits of the act beyond that of a mere master and servant relationship.' *Globe Grain & Milling Co.* v. *Industrial Commission*, 98 Utah 36, 91 Pac. 2d 512. The Utah statute construed by the Supreme Court in the above case, is the same as our statute. The burden of showing these matters of exemption is placed by the statute upon the appellee, and since they are stated conjunctively and not disjunctively, all three of these elements must be shown in order that exemption from the act be secured. *Unemployment Compensation Commission of North Carolina* v. *Jefferson Standard Life Ins. Co.*, 215 N. C. 479, 2 S. E. 2d 584. Statutes similar to the one under consideration have been construed. *Industrial Commission* v. *Northwestern Mutual Life Ins. Co.*, 103 Colo. 550, 88 Pac. 2d 560. In the interpretation of statutes, the primary rule is to ascertain and give effect to the intention of the Legislature, and this intention and meaning must primarily be determined from the language of the statute itself, and not from conjecture *aliunde*. 25 R. C. L., § 216, *et seq.*"

Another portion (subdivision g) of § 8550, not quoted by Judge Mchaffy in his opinion in the Payne case, which, in my opinion, indicates that the workmen whose services are under consideration here were employees within the meaning of this act is as follows:

"Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all the purposes of this act, whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of the work."

The majority of the court apparently holds that this case should be decided under the provisions of Act 155 of 1937, and, further, that the court's decision in the *Payne* case was correct. Applying that act and that decision to

the evidence in the case at bar, the conclusion is irresistible that these workmen were in fact and in law, in respect to Act 155, the employees of the Crossett Lumber Company, and not of the woods foremen whose status, it is contended, is, merely by the language of a printed contract, converted into that of an independent contractor.

## II.

It is conceded in the majority opinion that the fact that the suit was brought against a state official, instead of against the state itself, does not prevent this from being an action against the state.

In the case of *Pitcock* v. *State,* 91 Ark. 527, 121 S. W. 742, 134 Am. St. Rep. 88, Chief Justice McCulloch, speaking for the court, said: "A sovereign state cannot be sued except by its own consent; and such consent is expressly withheld by the constitution of this state. . . . The question whether a suit is one against a state is not necessarily determined by reference to the parties to the record. If the state is the real party in interest, though only its officers and agents are parties, then it is in effect a suit against the state, and falls within the rule of prohibition."

Nor is it denied that this is a suit to recover from a state official excise taxes collected by the state in its sovereign capacity. "The parties here correctly refer to the contributions (levied under the same act as is under consideration) sought to be collected as an excise tax. See *Buckstaff Bath House Co.* v. *McKinley, Commissioner,* 198 Ark. 91, 127 S. W. 2d 802." *McCain, Commissioner of Labor,* v. *Farmers Electric Cooperative Corporation, ante,* p. 15, 172 S. W. 2d 933.

But the majority holds that this is not a suit against the state because, as the majority says, it must be inferred that the commissioner was holding in escrow the money that he collected from the Crossett Lumber Company and that this money has not been mingled with other money collected for the same purpose. Such an inference, if well founded, would not prevent this from being a suit against the state, but there is nothing in the record,

there is not a syllable of testimony, to justify such an inference, nor was any such contention urged in any of the briefs or in any of the oral arguments made in this court. In fact, such an inference is contrary to the law. The law under which this money was collected prescribes in detail what should be done with funds thus collected. By the law certain distinct accounts are created for the proceeds of the collections arising from this tax and certain depositories for these funds are designated. The majority in its opinion says that it must be inferred that "the moneys so paid to the commissioner by Crossett under protest at no time were mingled with or became a part of the funds of the state . . ," but the law, § 8557 of Pope's Digest, after authorizing creation of the unemployment compensation fund, provides (subdivision (a) (5)): "All moneys in the fund shall be mingled and undivided." Thus the legislature explicitly directed the doing of the thing which the majority says it must be inferred was not done.

There is nothing in the law that provides for any escrow fund or trust fund in which this money may be held by the commissioner pending the outcome of any litigation. If the commissioner had been holding these funds in such account he would have been doing it in violation of the law and in violation of his official oath. The law presumes that public officials discharge their duty. "In the absence of any proof to the contrary, there is a presumption that public officers have properly discharged the duties of their office and have faithfully performed those matters with which they are charged." 43 Am. Jur., 254.

By § 22 of art. IV of the Constitution of Arkansas of 1836 it was provided: "The General Assembly shall direct by law in what courts and in what manner suits may be commenced against the State."

Section 21 of art. IV of the Constitution of Arkansas of 1861 is as follows: "The General Assembly may direct, by law, in what courts, and in what manner, suits may be commenced against the State."

Section 22 of art. IV of the Constitution of Arkansas of 1864 is as follows: "The General Assembly shall direct

by law in what courts and in what manner suits may be commenced against the State.''

Section 45 of art. V of the Constitution of Arkansas of 1868 is as follows: ''The General Assembly shall direct by law in what manner and in what courts suits may be brought by and against the State.''

In our present constitution (of 1874) no provision whatever for any suit against the state is made. On the contrary, by § 20, art. V, it is provided: ''The State of Arkansas shall never be made defendant in any of her courts.''

It thus appears that the men who wrote our constitution, having before them the provisions in our previous constitutions empowering the General Assembly to authorize suits against the state, deliberately chose to forbid absolutely such actions.

The historical background, as well as the plain letter, of the constitution, shows an unmistakable intention on the part of those who framed our organic law to prohibit the courts of Arkansas from entertaining jurisdiction of any suit against the state. This plain mandate of the constitution ought to be respected and enforced. It ought not to be circumvented by specious logic and tortuous reasoning based on unwarranted inferences.

McFADDIN, J., dissenting. I respectfully dissent from the majority herein, because, in my opinion, this is clearly a suit against the State of Arkansas, and therefore cannot be maintained. This issue was not raised by the appellants, and was not discussed in the briefs, but was injected into the oral argument before this court; and thus both sides had ample opportunity to discuss the issue. Besides, this is a matter of jurisdiction that raises itself; this court has no jurisdiction to allow a suit to be maintained against the state unless the state has, by constitutional and legislative process, permitted herself to be sued in her courts.

I find no provision, either in Act 155 of 1937 or in Act 391 of 1941 (being the acts under which appellee proceeded herein) that gives any taxpayer the right to pay

under protest or agreement and then sue for recovery. Subsection D of § 14 of Act 391 is the section that the appellee claims to justify this proceeding; but a study of. that section shows the contention of the appellee to be unsound. The commissioner could make an adjustment under that section if the commissioner so desired; but the commissioner refused to make the adjustment, and the act does not empower the courts to make the adjustment that the commissioner refused. The section certainly does not allow a dissatisfied taxpayer to go into court and sue the commissioner to make the adjustment that the taxpayer wants; but the very fact that the appellee can cite only this section for the maintenance of this suit clearly indicates that no other section can be found.

In the absence of any provision in either of the acts mentioned above, we look to the general law to see if there is any general provision of law that would give a taxpayer the right, in a suit like this, to pay the taxes and sue for recovery. I find no such law. The Crossett Lumber Company has cited the case of *Paschal* v. *Munsey,* 168 Ark. 58, 268 S. W. 849, as authority for a taxpayer to pay the taxes and sue for recovery, but that case does not sustain the position of the Crossett Lumber Company in the case at bar. In fact, a study of the case shows that it sustains the opposite contention. In *Pashal* v. *Munsey,* there was a proceeding under § 10180 of Crawford & Moses' Digest for the recovery of land taxes erroneously paid. The section is now 13963 of Pope's Digest and no one can seriously contend that the statutory authority in § 13963 of Pope's Digest is broad enough to permit the kind of suit here involved. But the very fact that there is a statutory proceeding for the recovery of land taxes and there is no statute for the recovery of unemployment compensation taxes, would show clearly that the legislature of Arkansas had no intention of allowing a suit like the present one to be maintained. So we may conclude that there is no general statutory authority allowing a suit like the present one to be maintained.

We come then to the fact that without any legislative sanction the Crossett Lumber Company has filed and

maintained this suit against McCain, Commissioner of Labor, and Shelton, Director of the Employment Security; and these parties are sued in their official capacities as officers of the State of Arkansas. The judgment of the lower court that this court is affirming reads as follows:

"Wherefore, the premises considered, it is by the court considered, ordered and adjudged that the plaintiff, Crossett Lumber Company, have and recover judgment against the defendants, W. J. McCain, as Commissioner of Labor of the State of Arkansas, and against Roland M. Shelton, as Director of the Employment Security Division of the Department of Labor of the State of Arkansas, and against all persons having the possession, custody or control of said funds and all defendants who may be involved in the execution and discharge of this judgment, in the sum of twenty-three thousand, seven hundred nineteen and 63/100 dollars ($23,719.63), together with all costs in this action incurred and accruing, for which let proper process of this court issue on demand of the plaintiff."

There is nothing in this record to show that the money paid by the Crossett Lumber Company was kept separate from other funds, and the judgment does not so state.

It cannot be said that the moneys collected from the Crossett Lumber Company were insurance moneys because in the case of *Buckstaff Bath House* v. *McKinley,* 198 Ark. 91, 127 S. W. 2d 802, this court held that moneys so collected were excise taxes. There is nothing in the statute that permits excise taxes to be held as trust funds or otherwise segregated.

McCain as Commissioner of Labor and Shelton as Director of the Employment Security Division were sued in their capacities as representatives of the State of Arkansas just as the State Highway Commission was a representative of the State of Arkansas in the case of *Arkansas State Highway Commission* v. *Nelson Brothers,* 191 Ark. 629, 87 S. W. 2d 394. In that case the previous line of decisions allowing a suit to be maintained

against the Highway Commission was overruled, and it was recognized that a suit against the Highway Commission was a suit against the State of Arkansas. The application of that case to the case at bar is clear and convincing. To like effect, see *Arkansas State Highway Commission* v. *Kincannon, Judge,* 193 Ark. 450, 100 S. W. 2d 969; *Page* v. *McKinley,* 196 Ark. 331, 118 S. W. 2d 235; and West's Arkansas Digest, "States," §§ 192 and 193.

The Crossett Lumber Company cannot say that it is without redress. It can always appear before the legislature and seek relief. It is the function of the court to interpret the constitution and the statutes, and remit parties to the legislature to obtain relief not authorized to be obtained in the courts.

Therefore, for the reasons herein stated, I most respectfully dissent from the majority opinion herein.