## EMPLOYMENT SECURITY DIVISION, ARKANSAS DEPARTMENT OF LABOR *v.* SHILOH TRUST AND SHILOH SERVICE STATION

5-5366                                                    460 S. W. 2d 66

### Opinion delivered November 16, 1970
[Rehearing denied December 21, 1970.]

*Herrn Northcutt,* for appellant.

*Putman, Davis & Bassett,* for appellees.

GEORGE ROSE SMITH, Justice. This is a proceeding to determine the taxability of Shiloh Trust under the Employment Security Law. Shiloh Trust is a small non-

profit organization that operates, among other activities, a service station at Sulphur Springs, Arkansas. In 1969 the appellant, the Employment Security Division of the Labor Department, issued a written determination holding that Shiloh Trust is liable for contributions under the law with respect to the remuneration it pays to its service-station attendants. On appeal that determination was affirmed by the Board of Review. The circuit court reversed the Board's decision, holding that the attendants do not perform services for wages and that no employer-employee relationship exists. The question here is whether there is substantial evidence to support the holding of the Board of Review. *Terry Dairy Products Co.* v. *Cash,* 224 Ark. 576, 275 S. W. 2d 12 (1955).

Shiloh Trust, as an entity, is so nearly unique that it must be described in detail rather than by reference to familiar legal concepts. We should note at the outset that when gaps appear in the proof, as they will, the omission is Shiloh's responsibility, for it has the burden of proof in seeking an exemption under the Employment Security Law. *McKinley* v. *R. L. Payne & Son Lbr. Co.,* 200 Ark. 1114, 143 S. W. 2d 38 (1940).

Basically, Shiloh is a comparatively small, self-sufficient organization, apparently having some interdenominational religious aspects. The organization originated in Sherman, New York, where it still conducts its largest activity: the sale to the public of what are referred to as "natural" foods. Shiloh also sells paper injectors (a patented device) and runs the filling station now in question.

In August of 1968 Shiloh moved its headquarters and most of its members to Sulphur Springs. There it bought and now occupies 118 acres that are the site of a dormitory and other buildings formerly owned by John Brown University. Shiloh has from 20 to 25 members in Arkansas and a few others in New York. The membership evidently includes some families with children.

The Reverend James Janisch, whose denomination

and ecclesiastical standing are not shown, is the sole trustee of the Trust and is the "pastor" of the group. He testified that Shiloh is basically a religious organization, though the record reveals nothing about the the group's religious activity, nor is it indicated that any outsider participates in or receives benefit from the group's religious endeavors.

Mr. Janisch gave this account of the members' daily life: They begin the day at six o'clock with an hourlong meeting, the nature of which is not shown. After breakfast together the members go to their assigned duties, which are described only as including "co-ordination as well as inspiration." The members lunch together and then resume their duties. They again assemble for dinner, after which there may be other work to do. If not, the members may linger for fellowship or engage in recreation of their own choice.

Our decision turns primarily upon Shiloh's property holdings, its business activities, and its payments to its members. The formal Trust was created in New York by Shiloh's founder, E. Crosby Monroe, who executed the governing declaration of trust in 1952. In that document Mr. Monroe declared that he held certain real and personal property in trust, as Trustee of Shiloh. The net income is to be used, in the trustee's uncontrolled discretion, exclusively for religious, charitable, scientific, literary, or educational purposes, which may include the rehabilitation, physically, mentally, and spiritually, of persons in need thereof; the provision of necessaries for needy persons; the maintenance of a school for instruction in religious subjects; and the carrying on of farming, processing of farm products, and marketing of such products. No part of the income or principal of the Trust is to inure to the benefit of any private individual except insofar as he is a beneficiary of the Trust.

Each successive trustee has almost unlimited authority in the acquisition, management, and disposition of the trust property. The trustee, among other powers,

can employ agents, clerks, or other employees and pay them reasonable compensation. There is an executive council, appointed by the trustee, but its only duties are to approve the trustee's accountings when the trustee chooses to submit them and to select successor trustees when vacancies occur.

Mr. Janisch, the third trustee in Shiloh's history, testified that the trust property is worth more than $150,000. It includes real estate and stocks and bonds. The profits from the Trust's three business activities are put into the trust fund.

All members of Shiloh receive their room and board free and are paid an allowance that varies in amount with age. Pre-school children receive $3.00 every four weeks. That allowance is increased in stages until it reaches $15.00 for students in the 11th and 12th grades. All adults receive $28.60 every four weeks, which is intended to provide for their clothing, toilet articles, minor medical bills, recreation, and other personal expenses.

The filling station at Sulphur Springs has been operated by a total of four Shiloh members. The station, which is leased to Shiloh, is open daily from 8:00 a.m. to 6:30 p.m. It services "pastoral vehicles" and sells petroleum products to the general public in competition with others.

The attendants at the station receive their regular benefits from the Trust: room, board, and $28.60 every four weeks. Mr. Janisch testified that all members of Shiloh receive their allowances whether they work or not, but he mentioned only one adult, almost 100 years old, who does not work. It is not shown how a person joins Shiloh or what is necessary for the maintenance of one's membership. The Board of Review, however, could reasonably have concluded that the members are normally required to perform services for the organization, which obviously could not support an indefinite number of persons without receiving something in return.

We are of the opinion that the Board's decision is supported by substantial evidence. The statutory definition of an "employing unit" includes a "trust . . . which has . . . one or more individuals performing services for it within this State." Ark. Stat. Ann. § 81-1103(g) (Repl. 1960). The statute defines "employment" as any service performed for an employing unit. *Id.,* subsection (i). "Wages" means all remuneration payable for personal services, including the cash value of remuneration paid in any medium other than cash. *Id.,* subsection (n).

The Board could readily have concluded that Shiloh is an employing unit operating a filling station for profit and paying wages to its members who work there. We are not impressed by the argument that the Employment Security Law simply has no application to an organization such as Shiloh. True, Mr. Janisch testified that a member could not become unemployed, because he would receive his allowance even if he stopped working. The Board might nevertheless have believed that unemployment is an economic hazard to which the service station attendants are subject. Among other possibilities, the Trust might become insolvent and shut down the station, or an attendant might withdraw from Shiloh and consequently be discharged, or he might be expelled from the organization for failure to abide by its rules.

We cannot disregard the fact that, even though Shiloh is a comparatively small group, our decision serves as a precedent in other cases. Here we have a self-sufficient colony whose members are earning a livelihood by carrying on business activities in competition with others. If Shiloh is exempt, the same exemption might be claimed by larger co-operative groups engaged in substantial business ventures and paying their members much larger sums than those involved here. The end result would be to cast upon the competitors of the exempt organization an unfair share of the tax burden that is needed to combat unemployment.

We find no merit in Shiloh's alternative contention, rejected both by the Board of Review and by the circuit

court, that the Trust should be exempt as a "fund or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes." Ark. Stat. Ann. § 81-1103(i) (6) (0). The controlling fact is not the recitations in the declaration of trust but the actual course of conduct pursued by Shiloh. At the hearing Shiloh failed to sustain its burden of proving its claim to exemption as an exclusively religious endeavor. To the contrary, the main aim of its commercial activities appears to be that of providing the living expenses of a small group of persons who have banded together as a self-supporting community. We note that Mr. Janisch testified, without producing documented proof, that the Federal Internal Revenue Service does not require Shiloh to withhold income taxes from its members' allowances, but the reason given is that such payments are considered to be dividends. There is no proof that the dividends are tax exempt, nor would such an interpretation by the Internal Revenue Service be conclusive with respect to the intent of our Unemployment Security Law. Moreover, Mr. Janisch admitted that Shiloh pays property taxes and school taxes, which of course would not be due if Shiloh were an exclusively religious or charitable organization. Upon this point we find the Board's decision to be amply supported by the proof.

Reversed.

HARRIS, C. J., and FOGLEMAN, J., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I disagree with the majority only in its finding substantial evidence that the services performed by the members of the Shiloh Trust in operating the service station were "for wages" as required by Ark. Stat. Ann. § 81-1103 (i) (5) (Repl. 1960). "Wages" for the purpose of the act are defined as "remuneration payable for personal services." Ark. Stat. Ann. § 81-1103 (n) (Repl. 1960). As weird and unrealistic as the method of operation of the Shiloh Trust, in the existing world, may seem to us, I cannot agree that those persons operating the service station receive remuneration for their personal services.

The trust is described as having been initiated for the rehabilitation of man. The personnel utilized in the service station are drawn entirely from the members of the group and reside on the trust property. The member who started the station is now assigned to another operation. The allowance to each member is called a "student requirement." It is determined solely by the age of the member. The chores or duties performed have no bearing upon the payment or its amount. People among the members who have reached "substantial" age and perform no services whatever receive the same allowance. One of these at Shiloh was stated to be an example. The income produced from the station is kept in a separate bookkeeping account, and the profit remaining after all bills are paid goes into the trust fund, from which allowances are paid to all members. A member who did not render any services would continue to receive his allowance. Four members have served at the service station, but not all of them simultaneously. Little profit has been realized at the service station. No time records are kept on chores or assignments performed by members.

The findings made by the circuit court include the following:

The decisive point in issue it seems to this Court is whether services are being performed for compensation. On this issue a determination is being made that the members do not work for wages as reflected by the record presented in the case. Recognition is given to the fact that Shiloh does not withhold any State or Federal income taxes from the allowance and do not deduct anything for Social Security taxes. Too, the fact that the Internal Revenue Service has ruled that the allowances do not constitute wages and therefore requires no deductions or withholdings appears to be highly significant.

The Employment Security Act specifically states a declaration of State public policy. An examination

of 81-1101 forces me to the conclusion that the individual members of Shiloh could never make claim against an employer; that there is no employer-employee relationship and that no contributions should be exacted.

In reaching this decision language used in the case of *McCain, Commissioner of Labor* v. *Crossett Lumber Company,* 206 Ark. 51, appears to be applicable:

". . . in construing an act imposing a special tax, such as we have here, we must construe the same strictly against the State and favorably to the taxpayer, and all ambiguities or doubts therein respecting liability for such tax must be resolved in favor of the taxpayer."

I submit that the eminent circuit judge was correct in his findings. Consequently, I would affirm his judgment.

I am authorized to state that HARRIS, C. J., joins in this dissent.