ST. VINCENT INFIRMARY MEDICAL CENTER *v.*
DIRECTOR OF LABOR

E 89-243 797 S.W.2d 460

Court of Appeals of Arkansas
En Banc
Opinion delivered October 17, 1990
[Rehearing denied October 31, 1990.]

*Jack, Lyon & Jones, P.A.*, by: *Philip K. Lyon* and *Gary D. Jiles*, for appellant.

*Bruce H. Bokony*, for appellee.

ERNIE E. WRIGHT, Acting Chief Judge. Appellant, St. Vincent Infirmary Medical Center (hereinafter referred to as SVI), made application in 1988 to the Arkansas Employment Security Division for a determination that services performed in its employ are exempt from coverage as an employer under the Arkansas Employment Security law. After a hearing by the Board of Review, the Board entered its order denying the exemption. This appeal is from that decision.

The applicable statute is Ark. Code Ann. § 11-10-210(a)(4) (1987). The statute provides that "employment" within the meaning of the Act does not apply to services performed:

(A) In the employ of:

(i) A church or convention or association of churches; or

(ii) An organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches[.]

In 1972 SVI was determined to be liable for the unemploy-

ment tax and this had not been contested. As SVI was exempt from federal income tax it exercised its option to reimburse ESD in lieu of paying the employment security tax.

Appellant contends the Board of Review erred in finding that SVI is not operated primarily for religious purposes, and in denying the exemption on that ground.

We agree with appellant and reverse.

The finding and decision of the Board recognizes the evidence establishes that appellant met all of the requirements for exemption under Ark. Code Ann. § 11-10-210(a)(4)(A)(ii) with the exception of the finding SVI is not operated "primarily for religious purposes." Therefore, we examine the evidence applicable to this specific issue.

The Sisters of Charity of Nazareth ("SCN") is a religious order of Catholic Sisters whose corporate name is Nazareth Literary and Benevolent Institution, a Kentucky charitable corporation organized in 1829 ("NLBI"). As a religious apostolate, the Sisters of Charity performs many charitable functions in the United States and abroad, including the operation of St. Vincent Infirmary in Little Rock, Arkansas, since 1888. St. Vincent Infirmary was organized as a separate Arkansas charitable corporation in 1958. Sisters of Charity of Nazareth Health Corporation, a Kentucky charitable corporation ("SCNHC"), was formed as a subsidiary of NLBI to manage health care operations for the Sisters of Charity of Nazareth. St. Vincent Infirmary is a subsidiary of SCNHC.

One of the stated purposes of SCNHC is: "To further any and all religious, charitable, scientific, literary or educational purposes in which Sisters of Nazareth now are and hereafter may become engaged, both within and outside the State of Kentucky, in carrying out the apostolate of the Sisters of Charity of Nazareth."

Article I of the Articles of SCNHC includes the following provision:

The Corporation shall be operated and conducted in conformance with the theology, philosophy, teachings, and doctrine of the Roman Catholic Church of the United

States; the philosophy and mission of the Sisters of Charity of Nazareth; the Ethical and Religious Directives of the Catholic Health Facilities; and other medico-moral directives promulgated from time to time by the National Conference of Catholic Bishops.

The three nonprofit corporations to which we have referred have interlocking director arrangements so that SCN has final control, subject only to the directives of the National Conference of Catholic Bishops and the Pope.

Article 1 of the Bylaws of SVI includes the following:

Section 2. Purposes and Catholic Identity. The purposes of the corporation are:

To further any and all religious, charitable, scientific, literary or educational purposes in which SCNHC or Nazareth Literary and Benevolent Institution ("NLBI") now is and hereafter may become engaged, both within and outside the State of Arkansas, in carrying out the apostolate of the Sisters of Charity of Nazareth.

St. Vincent Infirmary is a member of the Catholic Health Association of the United States, which is an ecclesial community participating in the mission of the Catholic Church through its ministry of healing.

The preamble to the Credo of SVI states:

THIS WE BELIEVE

. . . .that, as an integral part of the work of the Church, our basic purpose must be to serve God and preserve the dignity of all people by providing a consistently high quality of health care in response to the needs of our community and state.

*The Ethical and Religious Directives for Catholic Health Facilities* were approved in 1971 by the National Conference of Catholic Bishops. The preamble states:

Catholic health facilities witness to the saving presence of Christ and His Church in a variety of ways: by testifying to transcendent spiritual beliefs concerning life, suffering

and death; by humble service to humanity and especially to the poor; by medical competence and leadership; and by fidelity to the Church's teachings while ministering to the good of the whole person.

The directives prohibit a number of procedures which can be performed in Catholic health care facilities based upon religious and moral considerations of the Church.

St. Vincent Infirmary is listed in the official Catholic Directory of the Roman Catholic Church, and if an organization is listed in the official Directory of the Church the Internal Revenue Service deems its employees to be the employees of the church. However, this ruling of the Internal Revenue Service is not binding in the determination of the issue before us.

Sister Margaret V. Blandford, who is presently chairperson of the Board of SVI, testified she has been involved in the health ministry since 1945 and during most of this time has been head of a hospital; that she has served as a member of the legal corporate structure of NLBI and has served as coordinator of all of the Sisters of Charity of Nazareth hospitals. She stated the Sisters of Charity was founded in Kentucky in 1812 and was officially accepted as a religious congregation by having pontifical approval in Rome, and that the constitution and bylaws were approved in Rome. It is a religious order within the Roman Catholic Church. She further testified that once an organization is approved by the Church to carry out pontifically approved work it is governed by canon law as well as by legal laws. When asked the question, "In your opinion is St. Vincent Infirmary a church?" her reply was, "I think it's — it's a wing, so to speak of the church." She went on to say it exists because of the Church and to carry out an apostolic mission of the Church in operating a hospital. When asked if an indigent person unable to pay, came to the hospital in dire need of medical services would SVI take the patient, Sister Blandford answered, "Since the beginning in 1888, if any physician states that a person needs medical care and it has to be a physician, because we can't practice medicine — that patient is admitted to our hospital whether they can pay or not." When she was asked, "Sister, based on your educational background, both in Cannon [sic] Law, as well as the teachings of the church, and your experience in working with St. Vincent

Infirmary Medical Center for years, do you have any doubt in your mind, but that St. Vincent Infirmary Medical Center is an organization which is operated primarily for religious purposes?" her answer in part was, "I have no question in my mind because every day I know what my limitations of authority are as the chairperson and I know what channels that I have to report to, I know the authority of those over me and ultimately I know, that if we do not carry out our mission of service to people, based on our philosophy, our christian philosophy, that we will no longer be there." She testified, "Our basic purpose must be to serve God and preserve the dignity of people by providing consistently high quality of care in response to the needs of the patient — to the community." She stated, "We use the St. Vincent as a big hospital as a means to an end. It's kind of a conduit, so to speak, to carry out our mission of service to the sick." Religious services are conducted in the chapel maintained at the hospital.

When SVI buys, sells or mortgages property it must obtain approval from the Catholic Bishop of the Diocese and the Church in Rome.

Mr. Jack Reynolds, the chief executive officer of SVI testified he considered SVI to be the instrument enabling the Sisters of Charity of Nazareth to carry out the mission of the congregation to care for the sick and injured. He said the mission of SVI is to care for the ill and injured in a Christian environment, that is to minister to them in accordance with the values of SCN and the ethical and moral requirements of the Catholic Church. He identified SCN as a congregation of religious women that have agreed to devote their life to doing works in the service of God, works for mankind that are beneficial in the service of God.

In denying SVI qualifies for exemption from the employment security tax, the Board of Review found that SVI is not a church or convention or association of churches, and that, although it is operated, supervised, controlled and principally supported by the Catholic Church it fails to qualify for exemption under the second part of the statute because it is not "operated primarily for religious purposes" within the meaning of the statute. The Board found the religious purposes of SVI were secondary and incidental to SVI's function of providing health care and medical services.

We conclude the Board of Review properly found that SVI is not entitled to an exemption on the theory that its employees should be deemed to be employees of the Catholic Church as Ark. Code Ann. § 11-10-208 (1987) defines an "employing unit" for purposes of the unemployment insurance taxes as including any corporation which has one or more individuals performing services for it within the State of Arkansas. As SVI is incorporated as a nonprofit corporation it is an employing unit for purposes of the Employment Security Act. Arkansas Code Annotated § 11-10-208(2) (1987) specifically provides that each individual employed for work in the service of an employing unit shall be deemed to be engaged by the employing unit for all purposes. Therefore, the employees of SVI cannot be deemed employees of the Catholic Church.

On the issue as to whether SVI is operated primarily for religious purposes we must determine what is meant by the word "primarily" as used in the context of the statute in question. In *Malat* v. *Riddell*, 383 U.S. 569 (1966) the United States Supreme Court held that the word "primarily" as used in the Internal Revenue Code means "of first importance" or "principally." This is in keeping with the dictionary definition and the ordinary meaning. We believe this to be the meaning of the word as used in the statute in question.

We believe that in order for SVI to be deemed operated primarily for religious purposes, the religious purpose of SVI must be of first importance. While unquestionably SVI delivers health care and health care is not necessarily delivered for religious purposes, we find and conclude from the evidence as a whole that the health care provided by SVI is pursuant to the religious mission and purpose of the Sisters of Charity of Nazareth, a congregation of women existing within the framework of the Roman Catholic Church, and that SVI is operated under the sponsorship of SCN primarily for religious purposes in carrying out its religious mission in the service of God. We believe the religious motivation and purpose of SCN and SVI to be of first importance in the operation of the hospital.

The Arkansas Appellate Courts have not had occasion to decide the precise issue as to the meaning and application of the word "primarily" in the context of the statute in question. We find

that the Idaho Supreme Court in *Nampa Christian Schools Foundation* v. *State*, 110 Idaho 918, 719 P.2d 1178 (1986) dealt with this issue arising under an employment security tax exemption statute almost identical to the Arkansas statute in question. In that case a group of parents had organized a school to provide a Christian education to their children. The school was supported by several churches. The Idaho Industrial Commission found that the school was operated primarily for religious purposes, and was principally supported by a group of churches. On appeal, the decision of the Industrial Commission approving the employment security tax exemption was upheld. The case most directly in point appears to be *Kendall* v. *Director of Division of Employment Security*, 393 Mass. 731, 473 N.E.2d 196 (1985). The issue there was whether a training center for retarded children incorporated as a nonprofit corporation separately from the Catholic Church and owned by a religious order of nuns was exempt from employment security taxes under a statute almost identical to the Arkansas exemption statute. The Massachusetts Supreme Court stated:

> The board found that the Center satisfies these statutory requirements because its purpose, the rehabilitation of the mentally handicapped, is religiously motivated and the Center is subject to control by the Sisters of St. Francis of Assisi and, under canon law, by the Archbishop of Boston.

The Massachusetts court rejected appellant's contention that only a school devoted to religious instruction can be said to operate "primarily for religious purposes" and said:

> The claimant asks us to set aside the board's findings and adopt a narrower definition of "religious purposes" than that applied by the board. Essentially, she contends that only if a school is devoted to religious instruction can it be said to operate "primarily for religious purposes." We decline to impose such rigid criteria in defining religious pursuits. . . .

> One of the religious missions of the Center's founders, the Sisters of St. Francis of Assisi, is the educational care of mentally handicapped persons. The fact that the Center is open to handicapped children on a non-denominational basis is entirely consistent with the accomplishment of this

stated purpose. . . .

. . . .

. . .The fact that the religious motives of the Sisters of St. Francis of Assisi also serve the public good by providing for the education and training of the mentally retarded is hardly reason to deny the Center a religious exemption.

 This is not a case in which there is conflicting testimony to be resolved. Upon our review of all of the testimony, stipulations and exhibits we find that SVI is a hospital founded and operated primarily for religious purposes. It is clear from the record SVI would not have been founded and would not continue to operate but for the religious motivation and purpose. There is no substantial evidence in the record to support the finding of the Board of Review to the contrary. On appeal, we reverse where there is no substantial evidence to support the finding of the Board of Review upon which its decision is based. *Green* v. *Carder*, 282 Ark. 239, 667 S.W.2d 660 (1984); Ark. Code Ann. § 11-10-308(c) (1987).

 In our review of the record we have disregarded reference in appellant's reply brief to facts not in the record.

Reversed and remanded.

JENNINGS AND ROGERS, JJ., dissent.

JOHN E. JENNINGS, Judge, dissenting. Saint Vincent Infirmary Medical Center was originally determined to be liable for unemployment insurance taxes in 1972 and did not contest that decision. SVI had the burden of proof in seeking an exemption under the Employment Security Law. *Employment Sec. Div.* v. *Shiloh Trust*, 249 Ark. 429, 460 S.W.2d 66 (1970).

The issue is, as the majority states, whether the Board's finding that SVI is not operated primarily for religious purposes is supported by substantial evidence. In making that determination we are required to review the evidence in the light most favorable to the findings of the Board. *Harris* v. *Daniels*, 263 Ark. 897, 567 S.W.2d 954 (1978); *Rose* v. *Daniels*, 269 Ark. 679, 599 S.W.2d 762 (Ark. App. 1980). We are not free to substitute our findings for those of the Board of Review even though we might reach a different conclusion if we made the original determination upon

the same evidence considered by the Board. *W.C. Lee Construction* v. *Stiles*, 13 Ark. App. 303, 683 S.W.2d 616 (1985). Of course, the testimony of a party is always treated as disputed, as a matter of law. *Courtney* v. *Courtney*, 296 Ark. 91, 752 S.W.2d 40 (1988). Even if the evidence is undisputed, the drawing of inferences is for the Board, not the court. *Harris* v. *Daniels*, 263 Ark. 897, 567 S.W.2d 954 (1978); *W.C. Lee Construction, supra.*

Not all of the facts in this case support the position taken by the majority. Some excerpts from the testimony recited by the Board in its rather lengthy opinion follow:

> The Sister stated that the education and training that she received both as a nurse and as a hospital administrator qualify her to work in either a religious or a nonsectarian hospital. The Sister testified that SVI employees could perform comparable services in a lay hospital. The Sister agreed that SVI had approximately 2600 employees. The Sister stated that the average number of SCN members on the SVI board of directors has been about three and that an SVI director need not be a Catholic to qualify to serve on the Board. The Sister said that SVI was incorporated as a separate entity in 1958 and that lay people have constituted a majority on the SVI board of directors since approximately 1978. . . . The Sister stated that the hospital does not offer any religious classes but does have a chapel in which religious services are conducted. The Sister agreed that SVI generates a total annual income from all sources of approximately $155 million a year and that only about $100 thousand a year is received in private donations from the solicitation of funds. The Sister estimates that about 64 percent of gross revenues are received from federal and state sources, primarily Medicare and Medicaid. The Sister stated that SVI does not receive tithes or donations from the Church. . . . The Sister testified that the services performed by the various SVI employees in 1972 were basically the same as the services performed today. . . .
>
> The CEO testified that he has been the president and chief executive officer of SVI for the past ten years. . . . The CEO said that he considered himself an employee of SCN

and viewed SCN as the owner of the hospital. The CEO testified that he considered SVI a corporate instrument enabling SCN to carry out its mission of caring for the ill and injured.

. . . .The CEO stated that in the course of applying for the ERISA exemption the SVI Director of Personnel noticed that the statutory language in the federal ERISA exemption statute was very similar to the exemption language in the Arkansas unemployment compensation statute. The CEO said that SVI decided at that time to apply for the present exemption. . . . The CEO agreed that SVI's purpose of tending to the ill and injured was grounded in a religious motivation. . . . The CEO testified that when SVI first became covered under the Arkansas Employment Security Law in 1972, SVI probably did not realize it had an option. The CEO stated that SVI therefore decided not to contest the determination of liability and did not elect to be covered. . . . The CEO also agreed that SVI at that time elected to reimburse the fund for sums paid out to claimants rather than to be taxed on its payroll.

The CEO testified that he first began his employment with SVI as an assistant administrator in 1967. The CEO stated that he attended about 60 seminars and a summer program in hospital administration but admitted that none of his education or training was limited to religious hospital administration. The CEO further admitted that if the religious aspects of SVI were removed, the facility would still qualify for JCAH accreditation, but that if the health services aspects were removed, the facility would lose the accreditation.. . . The CEO agreed that he is an employee of SVI and that the services rendered by employees of SVI are patient care services. . . . The CEO testified that less than one percent of the hospital's total revenue comes from donations. The CEO admitted that the hospital does have a collection department and has hired legal counsel to collect debts. . . . The CEO admitted that less than one percent of the total revenue is spent on the chapel, chaplin and SCN visitors.. . . The CEO estimated that SVI admits approximately 60 to 70 thousand patients annually from inpatient, outpatient and emergency room admissions. The CEO

agreed that the bulk of these patients visit their doctors for medical problems rather than to have their spiritual needs met.

The CEO said that he was not aware whether SVI had to sign a declaration of nonsectarian use to receive Hill-Burton funds. The CEO admitted that SVI represented itself as a health care facility in order to qualify for the Hill-Burton funds. The CEO said that the only type of religious records maintained by SVI are notations on a patient's admission record of the patient's religious preference and whether or not a Catholic patient wants communion. . . . The CEO admitted that both the Workers' Compensation Commission and the Department of Health treat SVI as the employer of its employees. . . . The CEO stated that if SVI were required to perform a morally objectionable procedure it would lose its status as a Catholic hospital. . . . The CEO also admitted that the Department of Health recognizes SVI as a health care facility.

. . . .On the Report to Determine Liability attached as an exhibit to the affidavit, SVI exercised its option to reimburse rather than pay a direct contribution tax on its payroll.

The Senior Vice President for Human Resources testified that he has been responsible for SVI personnel for 19 years. . . . The vice president noted the similarities in language between the ERISA statutes and the exemption provision of the AESL. . . . The vice president stated that SVI has about 2650 employees and is very similar in structure or hierarchy to other hospitals in terms of basic medical operations although SVI does differ in having a Pastor of Care Department. . . . The vice president estimated that 99 percent of the jobs require lay training, education or experience and that only about one percent or eighteen jobs out of a total of about 2600 involved the religious aspect. The vice president testified that there is no requirement that an employee sign a declaration indicating support of the Catholic philosophy and that there is no grievance procedure in the employee handbook providing for the discipline of an employee for failure to support the Catholic philosophy. . . .

. . . .

The Personnel Director testified that he had served SVI in that capacity for over five years and had worked in the SVI personnel department since 1969. . . . The director said that SVI is self-funded in that it reimburses the fund on the basis of claims paid out to its former employees but does not pay a regular contribution tax on its payroll. . . .

. . . .

The Board explained the basis of its holding and the methodology used in reaching its decision:

> In its discussion under Part I of the Statute, the Board previously found that SVI is engaged in the delivery of health care in a religious context and with a religious motivation and purpose. SVI, therefore, has a commercial function as a hospital, infirmary and medical clinic and has a religious purpose of serving God and fulfilling the apostolate of the Sisters of Charity of Nazareth in delivering these services within a religious context. However, the Board hereby determines that the primary function of SVI is the commercial delivery of health care services as a hospital facility and medical institution and that the religious aspects are secondary. In reaching this conclusion, the Board has considered not only the nature and purpose of the employment of the SVI employees, the "employment itself" test urged by counsel for the ESD, but has used a general weighing and balancing test to ascertain the essential function of SVI. Although SVI was founded by a religious order of the Roman Catholic Church, was first brought into existence through a religious motivation and for a specific religious purpose and mission, and remains under the control of the Church up to the present day, the essential function of the institution remains that of a hospital, infirmary and medical institution. Through both inpatient, outpatient, and emergency admissions, SVI delivers health services to approximately 60,000 to 70,000 patients a year, according to the testimony of the CEO, very few, if any of whom, visit the facility to have their spiritual or religious needs met. SVI is open to all members of the public regardless of religious faith or denomination and none of its medical staff or other employees need be members of the Roman Catholic faith

to qualify for employment. The record indicates that only 15 to 13 of SVI's 2600 employees are associated with the in-house chapel or the other purely religious aspects of SVI. Less than one percent of the institution's revenues are allocated to the chapel, the payroll of the chaplain and the employees engaged in a purely religious function, or to the maintenance of the religious aspects of SVI. The testimony indicates that regular religious services are not held in the chapel and that the only religious records maintained for the patients are possibly the denomination of each patient and whether those patients of the Catholic faith desire Mass or the administering of other sacraments. Nor does the record indicate that SVI is operated for the religious training or education of those of the Roman Catholic faith. Although SVI does conduct some educational classes, the instruction is in the area of health care and community services rather than religion.

In determining "purpose" the Board obviously considered both motive and function. I do not find this objectionable. The construction of a statute by an administrative agency is entitled to consideration and is "highly persuasive." *Farm Bureau Mutual Ins. Co.* v. *Wright*, 285 Ark. 228, 686 S.W.2d 778 (1985); *Brawley School Dist. No. 38* v. *Kight*, 206 Ark. 87, 173 S.W.2d 125 (1943).

Were we deciding this case *de novo* or functioning as the factfinder I could not quarrel with the result the majority has reached. But that is not what we ought to be doing. This is the point made by Chief Justice Hammond of the Maryland Court of Appeals in *State Insurance Commissioner* v. *National Bureau of Casualty Underwriters*, 248 Md. 292, 236 S.2d 282 (1967):

> The required process [judicial review of administrative agency decisions] is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. . . . [J]udicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or substitution of judicial judgment for agency judgment.

236 A.2d at 292.

In *Kendall* v. *Director of Division of Employment Security*, 393 Mass. 731, 473 N.E.2d 196 (1985), the main case relied upon by the majority, the Massachusetts Supreme Judicial Court did not hold, *as a matter of law*, that the Board was required to find that the Cardinal Cushing School and Training Center was operated "primarily for religious purposes," but rather held only that such a finding was a permissible one.

> The law *requires* that the board's findings be upheld if they are supported by substantial evidence. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." Furthermore, in reviewing the board's findings we "give due weight to the experience, technical competence and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." We conclude that substantial evidence exists on the record to warrant the board's finding that the Center is "operated primarily for religious purposes."

473 N.E.2d at 199-200. (Emphasis added and citations omitted.)

While we rely on *Kendall* to reverse, we ignore its real basis for decision. In the case at bar the majority, in my view, exceeds our proper scope of review and simply decides the case anew.

Because I believe the findings and conclusions of the Board of Review are supported by substantial evidence, I would affirm.

ROGERS, J., joins in this dissent.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
OCTOBER 31, 1990

Petition for Rehearing denied; Motion to Stay Mandate granted.

*Philip Lyon*, for appellant.

*Bruce H. Bokony*, for appellee.

PER CURIAM. The Petition for Rehearing in this case is hereby denied.

The appellee's Motion to Stay Mandate is granted pending disposition of the appellee's Petition for Review filed in the Arkansas Supreme Court.

ROGERS and JENNINGS, JJ., concur in denial of Petition for Rehearing.

JUDITH ROGERS, Judge, concurring. I agree with the denial

of the petition for rehearing as no new grounds for consideration have been advanced. I write separately only to emphasize that I have not altered my position taken in the dissenting opinion in which I joined. I continue to feel that the court abandoned its traditional role and scope of review in ESD cases, which is to determine whether the Board of Review's decision is supported by substantial evidence when viewed in the light most favorable to the Board's decision.

JENNINGS, J., joins in this opinion.